# 20-3626, 20-3775

## United States Court of Appeals for the Second Circuit

---

JEFFREY LAYDON, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Appellant-Cross-Appellee*,

CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM,

*Intervenor Plaintiff*,

OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, STEPHEN P. SULLIVAN,

*Plaintiffs*,

v.

COOPERATIEVE RABOBANK U.A., BARCLAYS BANK PLC, SOCIETE GENERALE S.A.,

*Defendants-Appellees-Cross-Appellants*,

*(caption continued on inside cover)*

---

Appeal from the United States District Court
for the Southern District of New York (No. 1:12-cv-03419)

---

**BRIEF FOR DEFENDANTS-APPELLEES AND
DEFENDANTS-APPELLEES-CROSS-APPELLANTS**

---

Mark A. Kirsch
Eric J. Stock
Jefferson E. Bell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Thomas G. Hungar
Russell B. Balikian
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

*Counsel for Defendants-Appellees UBS AG and UBS Securities Japan Co., Ltd.*
*(additional counsel listed on inside cover)*

THE ROYAL BANK OF SCOTLAND GROUP PLC, UBS AG, LLOYDS BANKING GROUP
PLC, UBS SECURITIES JAPAN CO., LTD., THE ROYAL BANK OF SCOTLAND PLC,
RBS SECURITIES JAPAN LIMITED, TULLETT PREBON PLC, ICAP PLC,
ICAP EUROPE LIMITED,

*Defendants-Appellees,*

JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES PLC, JP MORGAN CHASE
& CO., CITIBANK JAPAN LTD., CITIBANK, JAPAN LTD., BNP PARIBAS S.A., CREDIT
AGRICOLE CORPORATE AND INVESTMENT BANK, NATIONAL ASSOCIATION,
CITIGROUP INC., CHUO MITSUI TRUST AND BANKING CO. LTD., SHINKIN CENTRAL
BANK, UBS AG, JOHN DOE 1-10, NOS. 1-50, THE SUMITOMO MITSUI TRUST BANK,
LIMITED, MARTIN BROKERS (UK) LTD., HSBC BANK PLC, HSBC HOLDINGS PLC,
CITIGROUP GLOBAL MARKETS JAPAN, INC., RESONA BANK LTD., THE SHOKO
CHUKIN BANK, LTD., THE BANK OF YOKOHAMA, LTD., MIZUHO TRUST & BANKING
CO., LTD., SUMITOMO MITSUI BANKING CORPORATION, THE BANK OF TOKYO-
MITSUBISHI UFJ, LTD., MITSUBISHI UFJ TRUST AND BANKING CORPORATION, THE
NORINCHUKIN BANK, SHINKIN CENTRAL BANK, CITIBANK, N.A., DEUTSCHE BANK
AG, R.P. MARTIN HOLDINGS LIMITED,

*Defendants.*

---

Leigh Nathanson
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100

Paul Alessio Mezzina
Kathryn Running
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

*Counsel for Defendant-Appellee-
Cross-Appellant Barclays Bank PLC*

David R. Gelfand
Tawfiq S. Rangwala
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5000

Mark D. Villaverde
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
(424) 386-4000

*Counsel for Defendant-Appellee-Cross-
Appellant Coöperatieve Rabobank U.A.
(f/k/a Coöperatieve Centrale
Raiffeisen-Boerenleenbank B.A.)*

David S. Lesser
Jamie Dycus
WILMER CUTLER PICKERING HALE
   & DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Counsel for Defendants-Appellees*
*The Royal Bank of Scotland plc, The*
*Royal Bank of Scotland Group plc,*
*and RBS Securities Japan Ltd.*

Steven Wolowitz
Andrew J. Calica
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

*Counsel for Defendant-Appellee-*
*Cross-Appellant Société Générale*

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellees make the following disclosures:

Defendant-Appellee-Cross-Appellant Barclays Bank PLC is a wholly owned subsidiary of Barclays PLC, which is a publicly held corporation, and no other publicly traded company owns 10% or more of Barclays Bank PLC's stock.

Defendant-Appellee-Cross-Appellant Cooperatieve Rabobank U.A. has no parent corporation and no publicly held corporation owns 10% or more of Rabobank.

Defendant-Appellee The Royal Bank of Scotland Group plc (now known as NatWest Group plc) ("RBS Group") is a public limited company organized under the laws of the United Kingdom. RBS Group has no parent company and no publicly held company owns 10% or more of its stock. Defendant-Appellee RBS Securities Japan Limited (now known as NatWest Markets Securities Japan Limited) is a wholly-owned subsidiary of Defendant-Appellee The Royal Bank of Scotland plc (now known as NatWest Markets Plc), which, in turn, is a wholly-owned subsidiary of RBS Group.

Defendant-Appellee-Cross-Appellant Société Générale has no parent company, and no publicly-held corporation holds 10% or more of its stock.

Defendant-Appellee UBS Securities Japan Co. Ltd. is a wholly owned subsidiary of Defendant-Appellee UBS AG. UBS AG is wholly owned by UBS Group

i

AG, a publicly traded corporation, and no publicly held corporation holds 10% or more of UBS Group AG stock. UBS Group AG is a publicly owned corporation and does not have a parent company.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................v

INTRODUCTION ..............................................................................1

STATEMENT OF THE ISSUES...........................................................5

STATEMENT OF THE CASE...............................................................6

    A.    Euroyen TIBOR and Yen LIBOR...........................................6

    B.    Euroyen TIBOR Futures Contracts ......................................8

    C.    Alleged Attempted Manipulation of Yen LIBOR and Euroyen TIBOR ...............................................................................13

    D.    Plaintiff's Trading ...........................................................16

    E.    Procedural History............................................................18

SUMMARY OF ARGUMENT ............................................................21

ARGUMENT ...................................................................................23

I.    The District Court Properly Granted Judgment For Defendants On The CEA Claims...................................................................23

    A.    Plaintiff's CEA Claims Are Impermissibly Extraterritorial. .............23

        1.    *Prime* Requires Dismissal.......................................24

        2.    Plaintiff Cannot Avoid *Prime* By Redefining The Relevant Market And Commodity............................35

    B.    Plaintiff Failed To Adequately Allege Causation And Damages. ......38

II.    The District Court Properly Dismissed Plaintiff's Sherman Act Claim For Lack Of Antitrust Standing. ...................................................42

    A.    Plaintiff Is Not An Efficient Enforcer................................42

        1.    Plaintiff's Alleged Injury Is Too Indirect. ................43

        2.    More Direct Victims Exist.......................................45

# TABLE OF CONTENTS
*(continued)*

                                                                    **Page**

        3.     Plaintiff's Damages Are Highly Speculative.............................47

        4.     There Is Substantial Risk Of Duplicative Recoveries Or Complex Apportionment. ............................................................48

    B.     Plaintiff Failed To Allege Antitrust Injury.............................................49

III.    The District Court Did Not Abuse Its Discretion In Denying Leave To Add RICO Claims.............................................................................51

    A.     Plaintiff's Proposed RICO Claims Were Impermissibly Extraterritorial. ........................................................................51

    B.     Plaintiff Lacks Statutory Standing To Raise The Proposed RICO Claims. .......................................................................56

    C.     Plaintiff's Proposed RICO Claims Were Inadequately Pleaded.........56

IV.    The District Court Did Not Abuse Its Discretion In Dismissing Plaintiff's Expanded CEA Claims.................................................................58

    A.     Plaintiff Lacks Class Standing To Litigate The New Claims. ............59

    B.     Plaintiff's New CEA Claims Are Time-Barred. ................................63

CONCLUSION ........................................................................................66

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
    771 F.App'x 498 (2d Cir. 2019) .................................................................43, 47

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974).................................................................................64

*Apple Inc. v. Pepper*,
    139 S.Ct. 1514 (2019).............................................................................48

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of
    Carpenters*,
    459 U.S. 519 (1983).................................................22, 43, 44, 47, 48

*Bascuñán v. Elsaca*,
    927 F.3d 108 (2d Cir. 2019) .......................................22, 51, 53, 54, 55

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977).................................................................................49

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
    986 F.3d 161 (2d Cir. 2021) .........................................................31, 33

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983).................................................................................64

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001) ...............................................................57

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991).................................................................................38

*European Cmty. v. RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir. 2014) ...............................................................53

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004).................................................................................37

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*FD Prop. Holding, Inc. v. U.S. Traffic Corp.*,
206 F.Supp.2d 362 (E.D.N.Y. 2002) ................................................................58

*Fire & Police Pension Ass'n v. Bank of Montreal*,
368 F.Supp.3d 681 (S.D.N.Y. 2019) ................................................................53

*Fisher v. Aurora Health Care, Inc.*,
558 F.App'x 653 (7th Cir. 2014) .....................................................................46

*Fletcher v. ConvergEx Grp. LLC*,
388 F.Supp.3d 293 (S.D.N.Y. 2019) ................................................................63

*FrontPoint Asian Event Driven Fund, LP v. Citibank, N.A.*,
2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)....................................................53

*FrontPoint Asian Event Driven Fund, LP v. Citibank, N.A.*,
2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018)........................................................53

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
991 F.3d 370 (2d Cir. 2021) ............................................................................53

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ..............................................................................8

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
711 F.3d 68 (2d Cir. 2013) ..............................................................................38

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ......................................... 10, 42, 43, 46, 47, 49, 50

*Grace Int'l Assembly of God v. Festa*,
797 F.App'x 603 (2d Cir. 2019) .......................................................................56

*Grochowski v. Phoenix Constr.*,
318 F.3d 80 (2d Cir. 2003) ..............................................................................59

*Harry v. Total Gas & Power N. Am., Inc.*,
889 F.3d 104 (2d Cir. 2018) ................................... 21, 36, 38, 39, 40, 41, 42, 50

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Hecht v. Commerce Clearing House, Inc.,*
    897 F.2d 21 (2d Cir. 1990) ................................................................58

*Hemi Grp., LLC v. City of New York,*
    559 U.S. 1 (2010) ................................................................................45

*Holmes v. Sec. Inv. Prot. Corp.,*
    503 U.S. 258 (1992) ...........................................................................56

*Ill. Brick Co. v. Illinois,*
    431 U.S. 720 (1977) ...........................................................................46

*IQ Dental Supply, Inc. v. Henry Schein, Inc.,*
    924 F.3d 57 (2d Cir. 2019) ................................................................47

*Knoll v. Schectman,*
    275 F.App'x 50 (2d Cir. 2008) ..........................................................58

*Koch v. Christie's Int'l PLC,*
    699 F.3d 141 (2d Cir. 2012) ..............................................................63

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ...........................................................................43

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR I"),*
    935 F.Supp.2d 666 (S.D.N.Y. 2013) ....................................10, 13, 53

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR II"),*
    962 F.Supp.2d 606 (S.D.N.Y. 2013) .............................35, 36, 37, 40

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR M&O"),*
    2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016) ................40, 50, 62, 65

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR VI"),*
    2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ................40, 44, 45, 47

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR VII"),*
    299 F.Supp.3d 430 (S.D.N.Y. 2018) ....................................11, 14, 47

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  332 F.Supp.3d 885 (S.D.N.Y. 2018) ...............................................27

*In re Platinum & Palladium Antitrust Litig.*,
  449 F.Supp.3d 290 (S.D.N.Y. 2020) ..............................................27

*McCray v. Lee*,
  963 F.3d 110 (2d Cir. 2020) ...........................................................42

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992) ...........................................................58

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
  1994 WL 88129 (S.D.N.Y. Mar. 15, 1994).................................57, 58

*Merryman v. Citigroup, Inc.*,
  2018 WL 1621495 (S.D.N.Y. Mar. 22, 2018)..................................63

*Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*,
  596 F.2d 573 (3d Cir. 1979) ...........................................................46

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) ...........................................................57

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010)........................................................................37

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ......................................................61, 62

*O'Rourke v. United States*,
  587 F.3d 537 (2d Cir. 2009) ......................................................18, 19

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) .............................. 21, 24, 25, 27, 28, 30, 31, 33, 34

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.*,
  572 F.App'x 60 (2d Cir. 2014) ..................................................22, 52

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Prime Int'l Trading, Ltd. v. BP PLC*,
   937 F.3d 94 (2d Cir. 2019) ...................................... 4, 20, 21, 23, 24, 25, 26, 27,
                                                                                28, 31, 32, 34, 35, 37, 38

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
   631 F.2d 10 (2d Cir. 1980) ...............................................................44, 48

*Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of N.Y.
   Mellon ("Policemen's Fund")*,
   775 F.3d 154 (2d Cir. 2014) ...........................................................23, 59, 60, 61

*RJR Nabisco, Inc. v. European Cmty.*,
   136 S.Ct. 2090 (2016)...................................................................51, 55

*S&A Farms, Inc. v. Farms.com, Inc.*,
   678 F.3d 949 (8th Cir. 2012) ...............................................................38

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
   366 F.Supp.3d 516 (S.D.N.Y. 2018) ......................................................10, 44, 53

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F.Supp.3d 521 (S.D.N.Y. 2017) .......................................................53, 56

*Spokeo, Inc. v. Robins*,
   136 S.Ct. 1540 (2016)......................................................................41

*Sullivan v. Barclays PLC*,
   2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ...................................44, 46, 49, 53

*Town of W. Hartford v. Operation Rescue*,
   915 F.2d 92 (2d Cir. 1990) .................................................................57

*United States v. Mead Corp.*,
   533 U.S. 218 (2001).........................................................................37

*United States v. Napout*,
   963 F.3d 163 (2d Cir. 2020) ...............................................................54

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*United States v. Pierce,*
224 F.3d 158 (2d Cir. 2000) ...............................................................57

*Weitzner v. Sanofi Pasteur Inc.,*
909 F.3d 604 (3d Cir. 2018) ...............................................................64

**Statutes**

7 U.S.C. §1a ........................................................................................36

7 U.S.C. §25 ...........................................................................23, 38, 63

18 U.S.C. §1962 ............................................................................57, 58

**Rules**

Fed.R.Civ.P. 9 .....................................................................................57

Fed.R.Civ.P. 15 .............................................................................58, 65

**Other Authorities**

*3-Month London Interbank Offered Rate (LIBOR), Based on Japanese
Yen*, Fed. Reserve Bank of St. Louis .................................................8

CFTC Amicus Br., 2017 WL 5664087 (Nov. 22, 2017) .......................37

Deferred Prosecution Agreement, U.S. Dep't of Justice (June 5, 2018) .................14

*JBA Euroyen TIBOR*, JBA TIBOR Admin. .......................................8, 13

Order, CFTC Docket No. 18-14 (June 4, 2018) ..................................14

*Outline for Three-Month Euroyen Futures*, TFX, Inc. ........................12

*TFX Daily Statistics Report (July 2, 2007)*, TFX, Inc. .......................11

## INTRODUCTION

This case is about Plaintiff's implausible attempt to blame his alleged loss from a single, isolated pair of trades on a supposed multiyear, international conspiracy among numerous foreign actors to episodically submit artificial estimates of foreign borrowing costs to foreign benchmark administrators. The alleged conspiracy had nothing to do with Plaintiff or his trades, and the district court correctly dismissed Plaintiff's claims on extraterritoriality and standing grounds.

Plaintiff contends that on two days in 2006, he traded futures contracts that (if held to maturity) would have settled by reference to the three-month Euroyen TIBOR benchmark rate on December 18, 2006. He allegedly opened his position in July, liquidated it in August, and lost about $2,000. At no time, however, were the *trading* prices for his contracts determined by contemporaneously published Euroyen TIBOR rates, as Plaintiff now argues on appeal; if they had been, Plaintiff would have *profited*. Trading prices for Euroyen TIBOR futures instead fluctuated constantly based on changing market dynamics and the market's predictions about the level at which the three-month Euroyen TIBOR rate would be set on each contract's predetermined settlement date (potentially years later). Although the contracts' final *settlement price* would have been calculated by reference to the Euroyen TIBOR rate published on the settlement date, Plaintiff did not hold any contracts to settlement.

1

Plaintiff nevertheless claims in this putative class action that he was injured by a purported international conspiracy carried out for the benefit of dozens of foreign financial institutions, including Defendants-Appellees Barclays Bank PLC, Coöperatieve Rabobank U.A., ICAP plc, ICAP Europe Ltd., Lloyds Banking Group plc, The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc, RBS Securities Japan Ltd., Société Générale, Tullett Prebon plc, UBS AG, and UBS Securities Japan Co. ("Defendants"), all of which are located in Europe or Asia.

Plaintiff's central theory of liability is that (1) these foreign entities allegedly reported or, for broker entities, facilitated reporting, artificial interest-rate estimates to the British Banking Association ("BBA") in London; (2) which then affected the BBA's calculation of its daily interest-rate benchmark, Yen LIBOR; (3) which then affected the interest-rate estimates that a different group of foreign entities reported to the Japanese Banking Association ("JBA") in Tokyo; (4) which then affected the calculation of the JBA's own benchmark, Euroyen TIBOR; (5) which then influenced market perceptions about what Euroyen TIBOR rates would be for three-month Yen deposits months in the future; (6) which then affected the trading prices of Euroyen TIBOR futures traded on exchanges around the world, including the United States; (7) which then injured Plaintiff when he traded.

Plaintiff's convoluted theory suffers from multiple fatal flaws. The problem is not just that Plaintiff's claim rests on a speculative, Rube Goldberg-like chain of

foreign events that renders it hopelessly attenuated and impermissibly extraterritorial. Trading prices for three-month Euroyen TIBOR futures are not tied directly to Euroyen TIBOR rates, and Plaintiff's trading prices certainly were not tied to rates for dates on which he did not trade or to rates *other than* the three-month rate. Yen LIBOR rates are even *further* removed from trading prices for Euroyen TIBOR futures, since Yen LIBOR is not even the benchmark used at settlement for those contracts. Yet the only acts of attempted manipulation that Plaintiff alleges in the months he traded:

- Involved Yen LIBOR, *not* Euroyen TIBOR;

- Occurred on dates when Plaintiff did not trade; and

- With two exceptions, pertained to interest rates for maturities other than three months—and those exceptions involved alleged *upward* manipulation, which under Plaintiff's theory would have *benefited* him.

For these reasons, Plaintiff's theory of liability, which is wholly implausible as to any market participant, is especially implausible as to him.

Plaintiff filed a kitchen-sink Second Amended Complaint ("SAC") asserting numerous causes of action against dozens of banks and brokers, including claims under the Commodity Exchange Act ("CEA"), 7 U.S.C. §1 *et seq.*, and the Sherman Act, 15 U.S.C. §1 *et seq.* The district court dismissed the antitrust claims for lack of antitrust standing but allowed the CEA claims to proceed. Plaintiff then sought to

3

add claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962, 1964(c), which the court denied because the claims were impermissibly extraterritorial and Plaintiff lacked statutory standing. When Plaintiff filed a Third Amended Complaint ("TAC") that sought to expand the putative class period without prior leave—effectively asserting new CEA claims based on different alleged conduct—the court held that Plaintiff lacked class standing to assert the new claims.[1] Finally, the court dismissed Plaintiff's remaining CEA claims as impermissibly extraterritorial under newly decided precedent. *Prime Int'l Trading, Ltd. v. BP PLC*, 937 F.3d 94 (2d Cir. 2019).

The district court was right to dismiss Plaintiff's claims. Plaintiff alleges almost exclusively foreign acts by foreign Defendants, and cannot avoid that problem by redefining the market and mischaracterizing benchmark interest rates as tradable commodities. Plaintiff further fails to identify a plausible, direct causal link between Defendants' conduct and his alleged injury, and fails to allege facts showing that Defendants' conduct injured (rather than benefited) him under his own causal theory. Plaintiff does not allege the domestic predicate acts or conscious agreement needed to support his RICO claims. And he fails to show that the district court abused its discretion in declining to add time-barred claims years after the litigation began.

---

[1] The court separately dismissed several foreign defendants for lack of personal jurisdiction.

Nearly a dozen regulators across the globe investigated conduct relating to the setting of LIBOR and other benchmarks, and billions have been paid in settlements and other sums relating to employee conduct concerning benchmarks for various currencies, including (but not limited to) Yen. Those remedies are unaffected by Plaintiff's failure to plead a plausible, domestic, timely claim against Defendants under U.S. law. Affirmance is warranted.

## STATEMENT OF THE ISSUES

1.      Whether Plaintiff's CEA claims are impermissibly extraterritorial or, alternatively, inadequately pleaded.

2.      Whether Plaintiff is an inefficient enforcer of the antitrust laws or, alternatively, failed to allege antitrust injury.

3.      Whether the district court's denial of leave to add a RICO claim was within its discretion because the claim was impermissibly extraterritorial, Plaintiff failed to demonstrate statutory standing, and Plaintiff inadequately pleaded predicate acts.

4.      Whether the district court's denial of leave to add new CEA claims was within its discretion because Plaintiff lacked class standing or, alternatively, because the claims were time-barred.

## STATEMENT OF THE CASE

### A.    Euroyen TIBOR and Yen LIBOR

Euroyen TIBOR and Yen LIBOR are different benchmark interest rates applicable to different interbank markets.  Plaintiff's pleadings confirm that they are calculated independently of each other, using materially different inputs submitted by different groups of banks, and pursuant to different methodologies.

Euroyen TIBOR is a Tokyo-based benchmark set by a panel of banks predominantly headquartered in Japan; it is intended to capture what the panel banks deem to be the prevailing interest rates at which prime banks on the Japanese offshore market will lend Yen-denominated time deposits (often called "Euroyen" deposits) to one another.  TAC ¶¶79, 122, 128 (JA1350, JA1369-70).  During the putative class period, the Tokyo-based JBA calculated Euroyen TIBOR as of 11:00 a.m. Japanese Standard Time each Tokyo business day.  *Id.* ¶126 (JA1370).  Rates were calculated for each of 13 different maturities, or "tenors"—ranging from 1 through 12 months, as well as 1 week—based on daily submissions from 18 JBA panel banks (which did not include defendants Barclays, Coöperatieve Rabobank, or Société Générale).  *Id.* ¶¶71, 73, 75, 125 (JA1370, 1347-49); *id.*, fig. 28 (JA1681).  Each tenor was "quote[d]" separately, *id.* ¶126 (JA1370), with no direct impact on other tenors, *e.g.*, *id.* ¶277 (JA1422) (one-month "unchanged"; three-month "increased"; six-month "declined").   The JBA calculated Euroyen TIBOR for each tenor by

6

discarding the two highest and two lowest submissions and then averaging the re-maining submissions. *Id.* ¶127 (JA1370).

Yen LIBOR, by contrast, is a London-based benchmark set by banks predom-inantly headquartered in Europe; it is intended to capture the rates at which banks operating in London believed they could borrow Yen-denominated funds for them-selves. TAC ¶131 (JA1371). During the putative class period, the London-based BBA calculated Yen LIBOR as of 11:00 a.m. London Time each London business day. *Id.* ¶130 (JA1370). Thus, Yen LIBOR was published 8 or 9 hours after Euroyen TIBOR had been calculated for that day, and 15 or 16 hours before Euroyen TIBOR would be calculated the following day, depending on Daylight Saving Time. Unlike Euroyen TIBOR, Yen LIBOR was calculated for each of 15 different tenors, ranging from overnight to 12 months, by discarding the highest and lowest 25% of submis-sions and taking the arithmetic mean of the remaining 50% of submissions. *Id.* ¶¶130-131 (JA1370-71). When the BBA had sixteen panel banks, for example, the top four and bottom four submissions were excluded. JA618. Only nine of the eighteen JBA panel banks also served on the panel for Yen LIBOR. TAC ¶81 (JA1351).

Thus, contrary to Plaintiff's suggestion on appeal, *see* Appellant's Br. 9-10 ("Br."), Plaintiff's own pleadings make clear that Yen LIBOR for one day did not determine the following day's Euroyen TIBOR, or vice versa. The benchmarks

7

served different purposes, were calculated using differing formulas, relied on submissions from different banks operating in differing markets, and were published at different times of day. Indeed, Euroyen TIBOR rates moved *upward* by more than two basis points between the two dates on which Plaintiff traded, whereas Yen LIBOR moved *downward* by more than one basis point over that same period.[2]

## B.    Euroyen TIBOR Futures Contracts

The financial instruments at issue here are three-month Euroyen TIBOR futures contracts—*i.e.*, "agreement[s] to buy or sell a Euroyen time deposit having a principal value of 100,000,000 Japanese Yen with a three-month maturity commencing on a specific future date"—traded on the Chicago Mercantile Exchange ("CME"). TAC ¶134 (JA1371); Br.8.[3] These standardized agreements provided that, on a specified "settlement" date in the future, the trader would pay to or receive

---

[2]    Specifically, three-month Euroyen TIBOR moved up from 0.40600 on July 13, 2006, to 0.43000 on August 30, 2006, whereas Yen LIBOR moved down from 0.41188 to 0.40125 over that same time period. *JBA Euroyen TIBOR*, JBA TIBOR Admin., http://www.jbatibor.or.jp/rate/pdf/EUROYEN2006.pdf, at 7-8 (last visited May 21, 2021); *3-Month London Interbank Offered Rate (LIBOR), Based on Japanese Yen*, Fed. Reserve Bank of St. Louis, https://fred.stlouisfed.org/graph/?g=D4fR (last visited May 21, 2021). The Court may take judicial notice of these "well-publicized" rates. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

[3]    Although the pleadings broadly referred to alleged manipulation of "Euroyen-based derivatives prices," *e.g.*, TAC ¶968 (JA1744), Plaintiff has confirmed that "[t]his case concerns only three-month Euroyen TIBOR futures contracts." Br.8; *see* TAC ¶974 (JA1748).

from the CME an amount corresponding to the difference between the price at which the contract was traded and the final settlement price. TAC ¶¶136, 142, 145 (JA1372-74). The final settlement price was set as 100 minus the three-month Euroyen TIBOR rate published upon the close of trading on the settlement date.[4] *Id.* ¶¶124, 141-142 (JA1369, JA1373). For example, if the three-month Euroyen TIBOR rate were 5.5% on the settlement date for a contract, the settlement price would be 94.5. *Id.* ¶¶138, 142 (JA1372-73).

The buyer of a Euroyen TIBOR futures contract is said to be taking the "long" position, betting that the contract price will increase. TAC ¶138 (JA1372). The buyer may predict, for example, that the market's expectations regarding future interest rates will decline, which would increase the value of the contract at settlement, *id.*, or that market forces will drive up futures prices in the near-term. A seller, like Plaintiff here, takes the "short" position, betting that the contract's price will decrease based on similar considerations. *Id.* The contracts at issue thus allowed traders to speculate on three-month Euroyen TIBOR movements for settlement dates "in the future." *Id.* ¶146 (JA1374). Euroyen TIBOR futures had quarterly settlement

---

[4] For simplicity, "settlement date" refers to the date of publication for the three-month Euroyen TIBOR rate that is used to determine the settlement price of a Euroyen TIBOR futures contract. *See* TAC ¶¶140-142 (JA1373).

dates extending out five years, meaning that "a total of 20 contract months [were] actively trading at any point in time." TAC ¶140 (JA1373).[5]

While the final *settlement price* of Euroyen TIBOR futures contracts is tied to the value of Euroyen TIBOR *on the settlement date*, most futures traders (like Plaintiff) "'close out of their positions'" well before settlement by, for example, "entering into offsetting contracts" that cancel out their positions. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F.Supp.2d 666, 682 (S.D.N.Y. 2013) ("*LIBOR I*"), *vacated and remanded in part on other grounds sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016); *see* TAC ¶145 (JA1374). When traders close out a Euroyen TIBOR futures position prior to settlement, the profitability of the position depends on the "difference between the initial purchase or sale price and the price of the offsetting transaction." TAC ¶145 (JA1374).

Crucially, pre-settlement trading prices for Euroyen TIBOR futures contracts had "no direct relationship" to the Euroyen TIBOR (or Yen LIBOR) rates on the date that the contracts were traded. *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F.Supp.3d 516, 547 (S.D.N.Y. 2018) (Sterling LIBOR). Euroyen TIBOR would determine the price only on the settlement date—and settlement could

---

[5] A three-month Euroyen TIBOR contract traded in February 2006, for example, could have a settlement date as early as March 2006, as late as December 2011, or on any of eighteen quarterly settlement dates in between.

be "years" away from the trading date, TAC ¶140 (JA1373).  The more remote the

settlement date, the less relevant the current rate for three-month Euroyen TIBOR

(let alone another benchmark rate) on a given trading date.

The prices at which Euroyen TIBOR futures traded were instead determined

moment-by-moment by market forces reflecting a mix of numerous factors.  Predic-

tions about "what Euroyen prices [would] be *in the future*"—*e.g.*, at "final

settlement"—influenced how much the market would pay for a contract.  TAC ¶146

(JA1374) (emphasis added).  Developing news, short- and long-term macroeco-

nomic market forces and trends, individual trading strategies, and many additional

factors would also be relevant.  These varied and fluid considerations meant that

trading prices "fluctuate[d] significantly within a trading day," and could "move in

inconsistent directions" from benchmark rates such as Yen LIBOR and Euroyen

TIBOR, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F.Supp.3d 430,

554 (S.D.N.Y. 2018) ("*LIBOR VII*") (U.S. Dollar LIBOR), both before and after that

day's Euroyen TIBOR was published.  Each futures contract thus had distinct intra-

day opening, high, low, and closing prices—as confirmed by publicly available

Tokyo Financial Exchange ("TFX") data dating back to July 2, 2007.[6]  The same

---

[6] *E.g.*, *TFX Daily Statistics Report (July 2, 2007)*, TFX, Inc., https://www.tfx.co.jp/publication/document/daily_statis_20070702_hp.pdf  (last visited May 21, 2021).  The daily listed "Sett[lement] Price" reflected "the volume-

contract might therefore be purchased or sold at different prices multiple times on the same day.

Plaintiff thus contradicts economic reality and his own pleadings when he asserts that "[t]he quoted price for the three-month Euroyen TIBOR futures contract [was] *always* 100 minus *that day's* annualized three-month Euroyen TIBOR rate," such that "on a day when [Euroyen TIBOR] was 5.50%, the futures price would necessarily be 94.50." Br.9. If that were true, intraday trading price fluctuations would not exist, and Plaintiff's short position would have been profitable: According to Plaintiff, short positions "profit from an increase in Euroyen TIBOR rates," TAC ¶138 (JA1372), and Euroyen TIBOR rates *did* increase while Plaintiff held his short position. *Supra*, at 8 & n.2. But given Plaintiff's allegation that he lost $2,150, TAC ¶911 (JA1724), it necessarily follows that he traded at prices that did not reflect the rates of three-month Euroyen TIBOR (or Yen LIBOR) on the dates of his trades.[7]

---

weighted average of the contract prices" for a specified time period and was used to facilitate daily "mark-to-market" payments; unlike the *final* settlement price, this price did *not* reference Euroyen TIBOR. *Outline for Three-Month Euroyen Futures*, TFX, Inc., https://www.tfx.co.jp/en/rules/pdf/w-01.pdf (last visited May 21, 2021).

[7] Specifically, Plaintiff alleges that on July 13, 2006, he sold three-month Euroyen TIBOR futures at a price of 99.315 per contract, even though three-month Euroyen TIBOR on that day was 0.40600 (or 0.41200 after the July 14 rate was published in Tokyo during the evening of July 13, Chicago time). These rates would mean a price of 99.594 (or 99.588 for July 14) under Plaintiff's erroneous view. Similarly, Plaintiff purchased offsetting contracts for 99.490 on August 30, 2006, when Euroyen TIBOR was 0.43000 (or 0.43200 for August 31), suggesting a price

In reality, the "100 minus Euroyen TIBOR" formula determined only the final settlement price of the futures contracts, not moment-by-moment pricing for trades. The suggestion that pre-settlement *trading* prices were "governed by a standardized mathematical formula," Br.9, is contradicted by Plaintiff's pleadings and inconsistent with the very idea of exchanges providing "virtually 24-hour access" to trade as many as 20 different contracts with rapidly changing prices and different settlement dates. TAC ¶¶135, 140 (JA1371, JA1373).

## C. Alleged Attempted Manipulation of Yen LIBOR and Euroyen TIBOR

By May 2008, news articles suggested that LIBOR for a variety of currencies had been subject to instances of manipulation to benefit panel banks' financial positions. *LIBOR I*, 935 F.Supp.2d at 700. Nearly a dozen regulators around the world investigated. The U.S. Department of Justice and the CFTC reached agreements with many Defendants, who agreed to cooperate rather than contest jurisdiction or otherwise litigate. *See* TAC (JA1319-23) (Table of Exhibits). Together these agencies collected more than $5.5 billion relating to employee conduct concerning benchmarks for various currencies, including the U.S. Dollar, Swiss Franc, British Pound Sterling, and Japanese Yen, and other regulators collected roughly $5 billion.

---

of 99.57 (or 99.568). *See* TAC ¶911 (JA1724); *JBA Euroyen TIBOR*, JBA TIBOR Admin., http://www.jbatibor.or.jp/rate/pdf/EUROYEN2006.pdf, at 7-8 (last visited May 21, 2021). Yen LIBOR for Plaintiff's trading dates was similarly far removed from his alleged trading prices. *Supra*, at 8 n.2.

Plaintiff's assertion that these regulatory settlements leave "little doubt that a conspiracy existed among the banks to price-fix the Euroyen rates" (Br.13) is wrong; they do not support, and Plaintiff's own allegations belie, the existence of a single, "international," "overall conspiracy [that] involved at least 19 banks and 3 brokers" who were all working toward a common goal of moving one or more Yen benchmarks in a particular direction at particular times. *Id.* at 1 & n.1.[8] Plaintiff's complaints instead make clear that any alleged manipulation was episodic, driven by the unilateral actions of individual employees, and tailored to those employees' individual positions and circumstances.[9]

Plaintiff typically alleges that a trader employed by one of the bank defendants asked a *Yen LIBOR* submitter employed by the same defendant to submit either a high or low rate on a particular tenor of *Yen LIBOR* for a particular date or set of dates, in an attempt to benefit a position that the employee had taken in an over-the-counter transaction "pegged to … published LIBOR on a given day," *LIBOR VII*,

---

[8] Not even the regulatory settlements allege such a conspiracy; in fact, Société Générale's settlements allege only intrabank Yen-related conduct. *See* Order, CFTC Docket No. 18-14 (June 4, 2018), https://www.cftc.gov/sites/default/files/ 2018-06/enfsocietegeneralesaorder060418.pdf; Deferred Prosecution Agreement, U.S. Dep't of Justice (June 5, 2018), https://www.justice.gov/criminal-fraud/file/ 1072451/download.

[9] To the extent Plaintiff seeks to reframe the alleged conspiracy on appeal as one to "break [BBA] rules" (Br.11), that formulation neither appears in nor is supported by any of his complaints.

299 F.Supp.3d at 487. *E.g.*, TAC ¶¶245-246, 268, 296 (JA1411-12, JA1419-20, JA1430). The attempted manipulation that allegedly resulted was thus employee-specific, date-specific, tenor-specific, bidirectional (*i.e.*, sometimes high, sometimes low—sometimes in opposite directions on the same dates, *e.g.*, *id.* ¶¶294, 522 (JA1429, JA1534); *id.* ¶¶255, 569 (JA1415, JA1552)), often "internal" among employees of the same defendant, *id.* ¶243 (JA1411), and virtually always intended to affect particular over-the-counter transactions that directly incorporated a specified daily benchmark rate (not futures contracts traded on exchanges).

Even if manipulation of three-month Euroyen TIBOR rates occurred on a particular date, it would not follow that the trading prices of Euroyen TIBOR futures were affected. As explained, pre-settlement trading prices were not tied to each day's Euroyen TIBOR rates (much less Yen LIBOR rates). *Supra*, at 10-13. If alleged manipulation affected trading prices at all, moreover, the bilateral nature of Euroyen futures contracts meant that only one side of the transaction could conceivably have been harmed; the other side would have benefited. The extent of benefit or injury (if any) would depend on the direction of the alleged manipulation for a particular tenor on a particular day, the impact (if any) of that activity on that day's benchmark calculation, and the impact (if any) of that day's benchmark rate not only on the market's collective estimate of future rates but also on the particular trades at the relevant time of day.

15

### D.     Plaintiff's Trading

Plaintiff does not allege facts indicating that any Defendant attempted to manipulate three-month Euroyen TIBOR (or even three-month Yen LIBOR) at any time relevant to his own transactions.  Plaintiff alleges that he transacted in Euroyen TIBOR futures just twice during the entire putative class period: once to open a "short position" on July 13, 2006 at an alleged price of "$99.315 per contract," and once to close the position on August 30, 2006 at "$99.490 per contract," months before the December 18, 2006 settlement date for the contracts.  TAC ¶911 (JA1724); *see id.* ¶142 (JA1373).  Plaintiff alleges that he sustained a loss of $2,150.35 from these offsetting transactions, *id.* (JA1724), even though Euroyen TIBOR rates increased, *supra*, at 8 & n.2.

The TAC does not identify *any* attempted manipulation of Euroyen TIBOR in July or August 2006—even though the TAC was filed after Plaintiff had already received the benefit of discovery, hundreds of pages of regulatory settlements, and cooperation from settling defendants.  The first alleged instance of Euroyen TIBOR manipulation occurred in December 2006, long after Plaintiff had closed his position.  Appendix to TAC, Dist.Ct.Dkt. 580-3 (Feb. 29, 2016) (Entry No. 45).

Even as to Yen LIBOR, Plaintiff identifies only seven days in all of July and August 2006 on which any Defendant allegedly attempted to manipulate *any* tenor, and Plaintiff did not trade on any of those dates.  TAC ¶¶326-327, 333, 574, 913,

915 (JA3759-60, JA1554, JA1725-26) (July 6█, 27-28; August ███ 29). Only two instances related to *three-month* Yen LIBOR; both stemmed from purely internal communications, and both pertained to dates after Plaintiff had already opened his position and at least a full week before he closed it. *Id.* ¶¶326-327 (JA3759) ███████████████. If anything, these allegations undercut Plaintiff's claims, because they involve attempted *upward* manipulation of Yen LIBOR, which, according to Plaintiff, is indicative of *lower* contract-settlement prices and thus would *benefit* an existing short position like his (if it affected Euroyen TIBOR trading prices at all). *Id.* ¶138 (JA1372) (short positions "profit from an increase in Euroyen TIBOR rates"); *id.* ¶912 (JA1724-25) (similar). Thus, Plaintiff's only allegations regarding manipulation of three-month benchmarks in July and August 2006 pertain to Yen LIBOR, not Euroyen TIBOR, and suggest (if anything) that his short position may have improved.

More generally, Plaintiff's complaint focuses almost exclusively on alleged manipulation of Yen LIBOR, not Euroyen TIBOR. Fewer than 25 of the 383 sets of communications listed in the appendix to Plaintiff's TAC even reference Euroyen TIBOR. Dist.Ct.Dkt. 580-3 (Entry Nos. 45, 60, 101, 152, 170, 211, 220, 235, 256, 267, 271, 281, 289, 295, 297, 298, 306, 308, 322, 325, 327, 335, 370).

### E.  Procedural History

Plaintiff amended his complaint three times below.  The 337-page SAC was filed in April 2013 and named dozens of defendants from around the world.  JA129.  Many of those defendants are no longer parties; all remaining Defendants are European or Asian entities.

The SAC alleges that, beginning in 2006, the named defendants manipulated Yen LIBOR and Euroyen TIBOR over a period of five years by making or facilitating artificially high or low submissions to the BBA and JBA.  SAC ¶1 (JA139).  As relevant here, the SAC claims that defendants violated, and aided and abetted violations of, the CEA, and that they violated the Sherman Act.  *Id.*  It purports to raise these claims on behalf of a putative class of "[a]ll persons or entities that engaged in a U.S. based transaction in a Euroyen TIBOR futures contract during the period of at least January 1, 2006 through at least December 31, 2010."  *Id.* ¶704 (JA461).[10]

The district court disposed of Plaintiff's claims in four principal orders, necessitated by Plaintiff's repeated attempts to add claims and defendants.

First, on March 28, 2014, the court dismissed Plaintiff's antitrust claim for lack of antitrust standing, holding that Plaintiff was not an "efficient enforcer"

---

[10]  The SAC also included a vicarious-liability claim under the CEA and an unjust-enrichment claim under state law.  SAC ¶¶728-730 (JA470-71).  Plaintiff has not challenged the dismissal of those claims, *see* SA12 n.2, SA22, and thus has waived any such challenge.  *O'Rourke v. United States*, 587 F.3d 537, 542 (2d Cir. 2009).

because his alleged injury was "too remote," "speculative," and "attenuated" from the alleged conduct, as it relied on a "causal chain with at least four discrete links." SA16-18. The court further held that Plaintiff failed to allege antitrust injury because the SAC "fail[ed] to provide any detail about the short positions he initiated," without which the court could not conclude that Plaintiff had been injured. SA15. However, the court held that Plaintiff adequately pleaded his CEA claims, without addressing extraterritoriality. SA2.

Second, on March 31, 2015, after Plaintiff sought leave to add new wire-fraud-based RICO claims in a 345-page Proposed Third Amended Complaint ("PTAC"), the court held that the RICO allegations were futile for lack of a sufficient territorial nexus and lack of standing. SA51-58. According to the court, the connection between the named defendants' alleged foreign conduct and the domestic effects was "far too attenuated" to show a permissibly domestic claim, SA54, and the lack of a "sufficiently direct connection" between the conduct and any injury similarly deprived Plaintiff of statutory standing, SA57.[11]

Third, on March 10, 2017, the court dismissed new CEA claims covering a six-month period that Plaintiff added to his 428-page TAC by amending the putative

---

[11]   Plaintiff also sought to add two new plaintiffs asserting new CEA and state-law claims, and to narrow the scope of the district court's antitrust holding. The district court denied those requests, SA43-51, SA58, and Plaintiff has waived any challenge to those decisions, *O'Rourke*, 587 F.3d at 542.

class period (without the court's prior leave). SA60-66. The court held that Plaintiff lacked class standing to assert the new claims, which dated from January 1, 2011 to June 30, 2011, because Plaintiff lacked a concrete interest in proving new claims that would turn on proof completely different from that underlying his own claims for July and August 2006. SA61, SA65.[12] The remaining CEA claims proceeded to discovery and briefing on class certification.

Fourth, following this Court's August 2019 decision in *Prime*, 937 F.3d 94—which held that a CEA claim involving foreign conduct was impermissibly extraterritorial even though the conduct affected domestic futures trading—Defendants moved for judgment on the pleadings. On August 27, 2020, the court held Plaintiff's CEA claims impermissibly extraterritorial under that "intervening change of controlling law." SA85. The court entered final judgment in Defendants' favor, and Plaintiff appealed.

Given Plaintiff's repeated revisions to his voluminous pleadings, it requires considerable chutzpah for Plaintiff to complain that the district court "just now issued a judgment permitting this appeal." Br.1. Indeed, Plaintiff's pleading antics

---

[12] In two separate orders, the district court also granted four foreign defendants' motions to dismiss for lack of personal jurisdiction. SA26, SA68. Those defendants are separately responding to Plaintiff's challenge to those dismissals.

mean that there are *three* relevant pleadings, depending on which claims are being evaluated and for what purpose:

| Claim | Complaint Evaluated by District Court |
|---|---|
| CEA (Sufficiency of Pleadings) | SAC (JA129) |
| Sherman Act | SAC (JA129) |
| RICO | PTAC (JA638) |
| CEA (Expanded Class Period & Extraterritoriality) | TAC (JA1309) |

## SUMMARY OF ARGUMENT

**I.** The district court properly dismissed Plaintiff's CEA claims as impermissibly extraterritorial. This Court's precedents foreclose claims based on predominantly foreign conduct. *Prime*, 937 F.3d 94; *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014). Yet Plaintiff's claims are based exclusively on alleged submissions by foreign individuals to foreign banking associations regarding foreign-currency benchmark interest rates. Plaintiff's attempt to recharacterize the relevant market and commodity to avoid that straightforward conclusion cannot be squared with the CEA.

Additionally, Plaintiff failed to adequately allege the essential element of damages caused by Defendants. As in *Harry v. Total Gas & Power North America, Inc.*, 889 F.3d 104 (2d Cir. 2018), Plaintiff's claims rely on a highly attenuated, multi-link chain of causation that fails to plausibly allege harm caused by Defendants; if anything, under Plaintiff's theory he would have *benefited* from their alleged conduct.

21

**II.**  The district court correctly concluded that Plaintiff lacks standing to bring his antitrust claim.  Plaintiff is not an efficient enforcer of the antitrust laws under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 542 (1983) ("*AGC*"), because (1) his claim relies on a highly attenuated, multi-step, and speculative causal chain; (2) as compared to Plaintiff, there are more direct alleged victims (direct counterparties); (3) his alleged damages are highly speculative; and (4) there is a high risk of both duplicative recovery and complex apportionment of damages.

Plaintiff also failed to adequately allege antitrust injury, as the SAC's generic allegations about his trades lack details necessary to find that he was injured by the alleged bidirectional manipulation.

**III.**  The district court did not abuse its discretion in denying Plaintiff leave to add RICO claims.  The foreign-focused scheme alleged by Plaintiff lacked the essentially domestic "core" that this Court requires for RICO claims predicated on wire fraud.  *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019); *Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F.App'x 60, 61 (2d Cir. 2014).

The Court may also affirm on the alternative ground that the PTAC's RICO claim relies on too remote and speculative a chain of causation.  Additionally, amendment was futile because Plaintiff failed to plead essential elements of a RICO claim, impermissibly lumping together numerous defendants and failing to

adequately allege the required pattern of at least two predicate acts of racketeering activity for each defendant.

**IV.** The district court did not abuse its discretion in dismissing Plaintiff's new CEA claims covering the first half of 2011. "[S]ignificant differences in the proof that [would] be offered" to support Plaintiff's own claims as opposed to the claims he seeks to assert on behalf of the class deprive him of a concrete interest in those claims. *Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, 775 F.3d 154, 163 (2d Cir. 2014) ("*Policemen's Fund*").

The Court may also affirm on the alternative ground that the new CEA claims are barred by the CEA's two-year statute of limitations. 7 U.S.C. §25(c).

## ARGUMENT

## I. The District Court Properly Granted Judgment For Defendants On The CEA Claims.

The district court correctly concluded that Plaintiff's CEA claims are "'impermissibly extraterritorial'" under *Prime*, 937 F.3d at 106 (SA87), and Plaintiff cannot avoid that conclusion by recharacterizing the relevant market and commodity. Additionally, Plaintiff failed to plausibly allege causation and damages.

### A. Plaintiff's CEA Claims Are Impermissibly Extraterritorial.

The CEA's private right of action does not extend extraterritorially. *Prime*, 937 F.3d at 102-04. To state a claim, a plaintiff "must allege not only a domestic transaction, but also domestic—not extraterritorial—*conduct* by Defendants that is

23

violative of" the CEA. *Id.* at 105. This rule "carrie[s] over" from securities-fraud litigation, *id.*, where a domestic transaction is "necessary" but "not alone sufficient" to state a claim, *Parkcentral*, 763 F.3d at 215.

### 1. *Prime* Requires Dismissal.

*Prime* affirmed dismissal of a CEA claim based on allegations strikingly similar to Plaintiff's here. The plaintiffs claimed that the defendants manipulated the market for North Sea oil, with the intent to manipulate benchmark prices published by an agency in London. 937 F.3d at 98-100. The benchmark, in turn, allegedly impacted the prices of futures contracts that the parties traded on domestic and foreign exchanges. *Id.*

This Court rejected the CEA claim as impermissibly extraterritorial. *Prime*, 937 F.3d at 106-07. As the Court explained, the claim relied on an "attenuated 'ripple effects' theory," whereby the "alleged manipulative … activity" affected prices for a "foreign commodity," which "affected a foreign benchmark," which was "disseminated by a foreign price-reporting agency," which "was then allegedly used (in part) to price futures contracts traded on exchanges around the world." *Id.* Indeed, "[n]early every link in Plaintiffs' chain of wrongdoing [wa]s entirely foreign"— making the claims even more clearly extraterritorial than in *Parkcentral*, where the conduct was deemed "'predominantly foreign'" despite alleged wrongdoing "on American shores." *Id.* (quoting *Parkcentral*, 763 F.3d at 216).

*Parkcentral* involved allegedly fraudulent statements that were made primarily in Germany but were "accessible in the United States" and even "repeated here by the defendants," including during "visits to the United States" and on "telephone calls" with the United States. 763 F.3d at 201, 207-08. Those statements in turn allegedly manipulated the stock price of a German corporation, which in turn affected the price of financial agreements (securities-based swaps) that were directly "pegged" to the price of that stock—and that were "entered into … in the United States" and governed by New York law. *Id.* Despite the presence of several domestic elements at the "second step" of the causal chain—"not the fifth," *Prime*, 937 F.3d at 107—this Court found that "the relevant actions" were "predominantly German" and the claim was thus impermissibly extraterritorial, *Parkcentral*, 763 F.3d at 216.

Here, the district court correctly concluded that Plaintiff's CEA claims were impermissibly extraterritorial under *Prime* and *Parkcentral*. SA86. All three cases rest on allegations that foreign entities manipulated a foreign benchmark or security, which in turn affected derivatives held domestically by the plaintiffs. Here, the alleged manipulation typically consisted of a Yen LIBOR submitter based in London (or another foreign city) submitting artificial borrowing estimates to the BBA in London, at the behest of a colleague at a trading desk in Tokyo (or another foreign city). *E.g.*, TAC ¶¶129-130, 176, 238-259, 267-289 (JA1370, JA1385, JA1409-16,

JA1419-26). As in *Prime*, Plaintiff attempts to link that foreign conduct to his domestic injury through an "attenuated 'ripple effects' theory." 937 F.3d at 106. Indeed, Plaintiff's "winding chain of foreign, intervening events" (*id.* at 108) is even longer than the chain in *Prime* because most of his allegations focus on manipulation of Yen LIBOR, not Euroyen TIBOR, *supra*, at 17, requiring a more attenuated causal chain that begins in London and ricochets off Tokyo to reach the United States.

Specifically, Plaintiff alleges that: **(1)** a foreign individual employed by a foreign Defendant reported artificial borrowing estimates to the BBA in London (or facilitated such reporting); **(2)** which potentially affected the BBA's calculation of Yen LIBOR, TAC ¶131 (JA1370-71); **(3)** which potentially affected the interest-rate information that banks operating in Japan reported to the JBA in Tokyo, *id.* ¶¶125-126 (JA1370); **(4)** which potentially affected the JBA's calculation of Euroyen TIBOR, *id.* ¶127 (JA1370); **(5)** which potentially affected global perceptions about "future" Euroyen TIBOR rates, *id.* ¶146 (JA1374); **(6)** which potentially "skewed" pre-settlement trading prices of three-month Euroyen TIBOR futures on exchanges around the world, including the United States, *id.*; **(7)** which potentially injured (rather than benefited) traders including Plaintiff, *id.* ¶911 (JA1724).

As the district court recognized, this causal chain is "almost entirely foreign." SA86. Plaintiff does not contend that *any* Defendant transmitted even a *single* false submission to the BBA (or the JBA) from the United States at the first causal step—

26

much less contest that these daily submissions were *predominantly* foreign.  SA87.

Because Plaintiff identified no "direct, traceable ways" to link the foreign submis-

sions to Plaintiff's alleged domestic harms, the district court correctly concluded that

his CEA claims are extraterritorial under *Prime* and *Parkcentral*.  SA86.  This con-

clusion aligns with other decisions rejecting similarly attenuated causal chains.  *E.g.*,

*In re Platinum & Palladium Antitrust Litig.*, 449 F.Supp.3d 290, 331-32 (S.D.N.Y.

2020); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F.Supp.3d 885, 918-19

(S.D.N.Y. 2018).

The extraterritorial nature of the claims is unaffected by the handful of alle-

gations of conduct concerning Euroyen TIBOR rather than Yen LIBOR.  *Supra*, at

17.  Whether the causal chain contains seven links or five, extraterritoriality ulti-

mately turns on the "foreignness of the facts constituting the defendant's alleged

violation."  *Parkcentral*, 763 F.3d at 215.  As described above, those facts are fun-

damentally foreign and can be linked to Plaintiff's alleged injury only through an

attenuated causal chain.

Likewise, it is immaterial whether the traders allegedly requesting manipula-

tion were motivated by transactions that had "U.S. counterparties," Br.45, or whether

they or the submitters "intended to deceive investors worldwide" including in the

United States, *Parkcentral*, 763 F.3d at 216; *see* Br.23-24.  That the foreign conduct

underlying a CEA claim might foreseeably affect the United States is not enough to

make the claim domestic. *Parkcentral*, 763 F.3d at 216. The question is whether the "alleged wrongful conduct"—*i.e.*, the "manipulation" that the CEA provisions Plaintiff invokes are "focus[ed] … on"—is "largely" or "predominantly foreign," *Prime*, 937 F.3d at 104, 108; *Parkcentral*, 763 F.3d at 201. Plaintiff's claim is impermissibly extraterritorial under that standard because the key manipulative conduct he alleges—*i.e.*, foreign banks' submission of interest-rate information to the BBA in London or the JBA in Tokyo in order to "fraudulently fix" "Yen-LIBOR and Euroyen TIBOR," Br.1—is fundamentally foreign. And all, or nearly all, "of the relevant conduct here relating to *that* focus occurred abroad." *Prime*, 937 F.3d at 108.

Plaintiff offers two primary responses. Neither can salvage his claim.

*First*, Plaintiff attempts to tighten his connection to the foreign conduct by arguing that the links in his causal chain are "immaterial steps that *always* follow from each other." Br.47-49. That is incorrect.

Most of Plaintiff's allegations of manipulation focus on Yen LIBOR, and thus begin with a foreign defendant's foreign employee making allegedly artificial submissions to the London-based BBA. That step undeniably does *not* always affect Yen LIBOR (let alone Euroyen TIBOR), as Plaintiff claims. The top and bottom quartiles of submissions are discarded, TAC ¶131 (JA1370-71), so an artificial submission might not affect the benchmark at all if, for example, the submission would

have been excluded whether or not the manipulation occurred. Plaintiff himself identifies numerous instances where changing a submission by as many as several basis points "still" results in the submission "be[ing] cut off" from consideration, "without affecting the fix[ing]" of Yen LIBOR. Dist.Ct.Dkt. 580-3 (Entry No. 170); *see id.* (Entry Nos. 68, 155, 172, 324, 332, 371).

Further, Yen LIBOR, even if successfully manipulated, has no "essentia[l]" connection to Tokyo-based Euroyen TIBOR (SA86)—the only benchmark that determined final settlement prices for the futures contracts here. TAC ¶124 (JA1369). Plaintiff's conclusory assertion that rates for these two benchmarks "follow each other as night follows day" is implausible *ipse dixit*. Br.7. Plaintiff's own allegations show that the rates are calculated independently, addressing different lending scenarios using different formulas and different submissions from different bank panels operating in different markets. *Supra*, at 6-8. Even if the rates moved similarly in response to similar external factors, that does not create a *causal connection between them*—which is also confirmed by the fact that, over the course of Plaintiff's trades, three-month Euroyen TIBOR *increased* by more than two basis points, while three-month Yen LIBOR *decreased* by more than one basis point. *Supra*, at 8 & n.2. Plaintiff cannot plausibly claim that rate changes in Yen LIBOR, however slight, inevitably alter submissions to the Tokyo-based JBA by a different panel of foreign banks operating under a different framework at a different time of day. *Supra*, at

29

6-8.  Even if Yen LIBOR rates affected submissions to the JBA on a given date, moreover, those submissions in turn would need to affect the published Euroyen TIBOR rate, accounting for the fact that there are eighteen submissions, with the top two and bottom two thrown out.  TAC ¶127 (JA1370).

Assuming that Euroyen TIBOR rates were manipulated on a given day in Tokyo, there *still* would be no direct connection between those rates and the pre-settlement trading prices of Euroyen futures on domestic exchanges for the reasons described above.  Contrary to Plaintiff's suggestion, Br.9, pre-settlement trading prices for Euroyen TIBOR futures are *not* equal to 100 minus the three-month Euroyen TIBOR rate on the trading date—as Plaintiff's allegations concerning his own trades confirm.  Rather, trading prices are determined by numerous, constantly changing factors, including "expectations of what Euroyen prices will be in the future," TAC ¶146 (JA1374), as well as short- and long-term macroeconomic market forces and trends, developing news, individual trading strategies, and other factors flowing from the independent decisions of buyers and sellers. *Supra*, at 10-13.  Trading prices thus fluctuate second-by-second, making it impossible for a once-a-day foreign benchmark rate to set prices for the entire trading day.

In sum, Plaintiff's causal chain is substantially "more attenuated" than the "'direc[t]'" pricing link between the swaps and the foreign securities in *Parkcentral*,

where this Court *still* held the claim impermissibly extraterritorial. *Prime*, 937 F.3d at 106.

*Second*, Plaintiff points to a few isolated instances where allegedly manipulative conduct by certain employees of certain Defendants had a domestic connection. Br.18-24, 43-46. Extraterritoriality, however, does not turn on whether Plaintiff can identify isolated or sporadic instances of domestic conduct amid an overwhelmingly foreign alleged scheme: "[T]he presumption against extraterritoriality would be a 'craven watchdog indeed' if it 'retreated to its kennel whenever *some* domestic activity is involved.'" *Prime*, 937 F.3d at 102.

In *Parkcentral*, for example, some alleged misrepresentations at the center of the case were "directed into the United States" through "telephone calls or on visits to the United States" and were "made to investment managers in New York"—yet that did not change the predominantly foreign nature of the claim. 763 F.3d at 207-08, 215-16. Similarly, this Court recently applied *Parkcentral* to conclude that an Exchange Act claim involving a private agreement between two foreign entities was impermissibly extraterritorial, notwithstanding a substantial number of domestic connections, including allegations that the Bermudian defendant made a "misstatement from New York," had its "principal place of business and CEO and directors in New York," and executed the agreement in New York. *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 167-68 (2d Cir. 2021).

31

In the context of Plaintiff's CEA price-manipulation claim, the "focus" is on Plaintiff's allegations of "manipulative conduct," and there is no doubt that these allegations are "'so predominately foreign as to be impermissibly extraterritorial.'" *Prime*, 937 F.3d at 106, 108. Plaintiff alleges that over the course of five years, foreign employees of foreign entities manipulated foreign benchmarks by making artificial submissions to the BBA in London or the JBA in Tokyo. *Supra*, at 25-26. Plaintiff does not dispute that "the majority, or even the supermajority, of the conduct occurred abroad." Br.46. When defending his RICO claim, moreover, Plaintiff "d[id] not dispute that the alleged enterprise" was itself "foreign." SA54.

Against that fundamentally foreign backdrop, the handful of isolated domestic connections that Plaintiff cites, Br.18-20, 43-45, do not remotely rebut the district court's determination that Plaintiff's CEA claims *as a whole* are "'predominantly foreign.'" SA87. Even on their own terms, Plaintiff's handpicked examples of domestic connections fall short. For example, many of the individuals whose domestic connections Plaintiff emphasizes were based *outside* the United States, and there is no dispute that the vast majority of their conduct was foreign. For example, "UBS Traders Hayes and Darin," Br.18, were based "in Tokyo" and "in Singapore, Tokyo, and Zurich," respectively, JA2040; the "three ICAP brokers" and the "R.P. Martin employee" with whom Hayes communicated, Br.18-19, were all based outside the United States, TAC ¶¶810-811 (JA1649); JA2440; "Rabobank's Allen and Conti,"

Br.18, were both "in London," TAC ¶231 (JA1406); JA2742-43; "Tullett Prebon's brokers," Br.20, were "U.K. based," JA3177; and "[RBS's Neil] Danziger," Br.20, was based "in London" and allegedly communicated with another employee "in To-kyo," TAC ¶¶178, 270 (JA1386, JA1420).  It is "neither here nor there," *Cavello*, 986 F.3d at 167, that Plaintiff alleges that one of these foreign-based individuals happened to discuss alleged manipulation ███████████████████████████ ████████████████████ (years after Plaintiff traded).  TAC ¶97 (JA3670-71). Similarly immaterial is whether certain chats between foreign individuals happened to be "routed through servers located in New York."  Br.18-19, 43-45.  Such fortui-tous and attenuated connections are at most a "minor domestic element" in an "overwhelmingly foreign" scheme, *Parkcentral*, 763 F.3d at 216.

Plaintiff claims that in October 2007, a "New York-based Barclays executive directed subordinates" to "move Yen-LIBOR lower to benefit his Euroyen-based swaps book," Br.43.  But the TAC alleges only that the executive told subordinates to "██████" a "████████████████████████████," TAC ¶102 (JA3672-73), not to manipulate Yen LIBOR.  In any event, such isolated communications would not render Plaintiff's claims domestic.  The plaintiffs in *Parkcentral* alleged much stronger domestic ties, including that the alleged misrepresentations were "di-rected into the United States" and "made to investment managers in New York" through "telephone calls or on visits to the United States"—yet those contacts did

not change the predominantly foreign nature of the claim. 763 F.3d at 207-08. Nor do Plaintiff's pleadings suggest that foreign individuals "caused false Yen-LIBORs to be published" specifically "in the Southern District of New York." *Contra* Br.18. The document cited by Plaintiff indicates only that Canadian non-party "Thomson Reuters" made Yen-LIBOR rates generally accessible "publicly, *including*" by making them accessible "in New York," among other places. JA2038 (emphasis added). This Court has already held that making "false statements ... intended to deceive investors worldwide" accessible in the United States, and even "repeat[ing]" them here, does not suffice to make the conduct sufficiently domestic. *Parkcentral*, 763 F.3d at 201, 216.

More generally, Plaintiff fails to identify *any* domestic conduct involving three-month Yen LIBOR or Euroyen TIBOR in July or August 2006, when Plaintiff traded. And certain Defendants' decisions to cooperate with U.S. authorities *after* the fact, rather than challenging their jurisdiction, do not establish that Plaintiff pleaded "domestic—not extraterritorial—*conduct* by Defendants that is violative of a substantive provision of the CEA." *Prime*, 937 F.3d at 105.

In short, Plaintiff's cited connections with the United States are isolated and tenuous, and do not state a domestic claim. As in *Prime* and *Parkcentral*, the "foreign elements" plainly "predominat[e] in this case." *Parkcentral*, 763 F.3d at 217.

### 2. Plaintiff Cannot Avoid *Prime* By Redefining The Relevant Market And Commodity.

Plaintiff seeks to evade this Court's precedents by recharacterizing this case as one about "manipulation of a domestic commodity market." Br.36-43. That characterization is implausible and inconsistent with Plaintiff's own allegations.

As Plaintiff acknowledges, the only domestic market at issue here is the CME market for "three-month Euroyen TIBOR futures contracts." Br.8 (citing TAC ¶135 (JA1371)). Plaintiff does not allege that Defendants directly attempted to manipulate the trading prices of futures on this market; the alleged manipulation targeted foreign interest-rate benchmarks associated with the market for Yen-denominated interbank loans outside Japan (*i.e.*, Euroyen time deposits). TAC ¶122 (JA1369). *That* is the relevant commodity market, and it is not a "domestic" one. Br.36; *see Prime*, 937 F.3d at 99-101 (distinguishing futures market from underlying foreign crude-oil market).

Plaintiff's contrary view that the CME is the relevant "domestic commodity market" rests on the false premise that LIBOR and TIBOR "are *themselves* commodities traded in domestic interstate commerce." Br.36. This position "is simply implausible." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F.Supp.2d 606, 612-14 (S.D.N.Y. 2013) ("*LIBOR II*"). The CEA defines "commodity" to mean "goods and articles"—including "wheat," "cotton," "livestock," and "frozen concentrated orange juice"—along with "services, rights, and interests" in

35

which "contracts for future delivery are presently or in the future dealt in." 7 U.S.C. §1a(9). Yen LIBOR and Euroyen TIBOR are none of those things. They are benchmark interest rates that financial instruments sometimes reference, *LIBOR II*, 962 F.Supp.2d at 612, not "goods," "articles," "services, rights, [or] interests," and they cannot be "deliver[ed]" to a buyer or otherwise exchanged, bought, sold, or owned. 7 U.S.C. §1a(9). Indeed, there is no "price of LIBOR independent from LIBOR itself," and there accordingly can be no market for trading these benchmark rates themselves. *LIBOR II*, 962 F.Supp.2d at 612. That "certain commodities prices *incorporated* LIBOR rates" at settlement does not mean the rates themselves are commodities. *Harry*, 889 F.3d at 113 (emphasis added).

Traders can use Euroyen TIBOR futures to speculate on Euroyen TIBOR's future movements not because the rate itself is a tradeable commodity, but because futures contracts are tied to an underlying commodity whose future value at settlement is tied to future Euroyen TIBOR rates—namely, "a Euroyen time deposit having a principal value of 100,000,000 Japanese yen with a three-month maturity commencing on a specific future date." TAC ¶¶134-135 (JA1371). And while Plaintiff's appellate brief (and the district court's initial CEA opinion) cites statements in CFTC settlement orders offhandedly describing TIBOR as a "commodit[y]," Br.36 (quoting JA1851; emphasis omitted); SA8-9, these "stray clauses" do not provide a "substantial ground for difference of opinion," *LIBOR II*,

962 F.Supp.2d at 613-14: The CFTC's conclusory statements are not authoritative, formal, considered judgments entitled to deference, *see United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001), and they were made in the context of CEA provisions other than Section 22. Plaintiff has not rebutted Judge Buchwald's persuasive analysis of this issue in *LIBOR II*, 962 F.Supp.2d at 613-14.

Because Yen LIBOR and Euroyen TIBOR are not "commodities" traded in domestic markets, Plaintiff's parade of horribles and policy arguments about the consequences of affirmance are unavailing. Br.38-39. Affirmance will not affect legitimate efforts to protect true domestic commodity markets—and certainly will not "cast doubt on" long-final settlements reached between U.S. agencies and Defendants. Br.39. Private damages suits present extraterritoriality concerns distinct from those associated with government enforcement actions, *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 171 (2004); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 284 n.12 (2010) (Stevens, J., concurring in judgment), and *Prime* rightly did not tether its extraterritoriality analysis to the CFTC's assertions about the scope of its own enforcement authority, 937 F.3d at 104-07; *contra* CFTC Amicus Br., 2017 WL 5664087, at *23 (Nov. 22, 2017). Ultimately, allowing a private CEA claim for conduct as thoroughly foreign as that alleged here would improperly expand the CEA's reach beyond U.S. borders, creating potential for "'clashes

between our laws and those of other nations.'" *Prime*, 937 F.3d at 102 (quoting

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).

### B. Plaintiff Failed To Adequately Allege Causation And Damages.

Affirmance is also warranted because Plaintiff failed to allege the essential

CEA element of actual damages. The Court "may affirm, of course, 'on any ground

which finds support in the record.'" *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711

F.3d 68, 75 (2d Cir. 2013).

Section 22 of the CEA grants a private cause of action only to those suffering

"actual damages … caused by [the alleged] violation." 7 U.S.C. §25(a)(1). This

provision requires more than Article III injury-in-fact. *Harry*, 889 F.3d at 112. A

plaintiff "must show that the CEA violation *proximately caused* the damages" for

which relief is sought. *S&A Farms, Inc. v. Farms.com, Inc.*, 678 F.3d 949, 953 (8th

Cir. 2012). Specifically, a plaintiff claiming market manipulation must show with

sufficient detail (1) that the defendant "t[ook] an action that had an impact on the

[plaintiff's position]," and (2) that the impact was "negative." *Harry*, 889 F.3d at

112.

In *Harry*, this Court affirmed dismissal of CEA claims involving futures and

other derivative contracts because the plaintiffs failed to plausibly plead actual dam-

ages. 889 F.3d at 115-16. Although the plaintiffs alleged injury due to the

manipulation of natural-gas prices at regional trading hubs, *id.* at 113, these

allegations were "not plausible" because the contracts were not linked to the gas traded at those hubs, and the plaintiffs did not identify another mechanism by which their contracts were affected, *id.* at 115. The Court explained that plaintiffs neither (1) transacted in "privity" with a defendant who injured them (the "most direct way to plead [the] harm"), nor (2) plausibly alleged any "formal rule-based price linkage" between their own contracts and those being manipulated. *Id.* at 112-13. Instead, the plaintiffs (3) relied on a series of "inference[s]" suggesting that the prices of their contracts were affected by a defendant's transactions "with a third (or fourth or fifth…) party." *Id.* at 112. In this third-tier situation, damages are not "inherently plausible," as there is generally no "readily discernible" and "tangible mechanism" of tracing an injury from the defendant's actions. *Id.* at 112-13. Unless the plaintiff can "make the connection between a defendant's manipulation and a plaintiff's actual injury plausible," by "plead[ing] with greater detail," the CEA claim fails. *Id.* at 113-14.

Like the unsuccessful plaintiffs in *Harry*, Plaintiff relies exclusively on the third (and least plausible) tier of causation. *See* Br.22 n.6 (counterparties are "unknowable"); *supra*, at 10-13 (no rule-based linkage). He accordingly must plead, in detail, both a "tangible mechanism" whereby Defendants' alleged actions "had an impact" on his position that was "more than margina[l]," *and* that this impact was "negative." *Harry*, 889 F.3d at 112-13. Plaintiff does neither.

*First*, Plaintiff has not identified a tangible mechanism linking Defendants' conduct to his own. As noted, Plaintiff's claims rest on a seven-link causal chain: that Defendants made (or facilitated making) artificial Yen LIBOR submissions to the BBA, which potentially affected Yen LIBOR, which potentially affected Euroyen TIBOR submissions, which potentially affected Euroyen TIBOR, which potentially affected market perceptions of future Euroyen TIBOR rates, which potentially affected pre-settlement trading prices for Euroyen TIBOR futures, which potentially injured Plaintiff. *Supra*, at 26. None of those steps follows necessarily from the others, and Plaintiff's own allegations sever the links between Yen LIBOR rates and Euroyen TIBOR submissions at steps 2-3, and between Euroyen TIBOR rates and Euroyen TIBOR futures prices at steps 4-6. *Supra*, at 6-8, 10-13, 28-31. Other courts have held similar causal chains too speculative. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *21-23 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*"). Indeed, *Harry* itself relied on the "sensible reading of the [CEA]" articulated in *LIBOR II*, *Harry*, 889 F.3d at 111, where the court rejected CEA claims like Plaintiff's. 962 F.Supp.2d at 620-24.

Even if Plaintiff's causal theory were credited in the abstract, he has not shown that *he* was materially affected by Defendants' actions. Plaintiff asserts "'day-to-day' and 'episodic'" manipulation, meaning that "[p]roof that a bank caused an artificial price one day will not determine whether it did so on another day." *In re*

*LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1558504, at *9 (S.D.N.Y. Apr. 15, 2016) ("*LIBOR M&O*"). Yet the SAC "d[id] not identify or describe a single actual transaction underlying his claim." SA15. And while the TAC alleged that Plaintiff initiated a short position in Euroyen TIBOR futures on July 13, 2006, and closed the position at a loss on August 30, 2006, TAC ¶911 (JA1724), Plaintiff did not plead facts suggesting *any* attempted manipulation of *any tenor* of Euroyen TIBOR during that time period—or reconcile his loss-causation theory with the fact that Euroyen TIBOR *increased*. *Supra*, at 8 & n.2, 16. Even as to Yen LIBOR, Plaintiff cited only two alleged instances of attempted manipulation of three-month tenors during this period, both of which took place *after* he initiated his position and a week or more *before* he closed it. *Supra*, at 16-17. These allegations relating to Yen LIBOR do not remotely show a "plausible" impact on Plaintiff's Euroyen TIBOR futures position. *Harry*, 889 F.3d at 112. And Plaintiff cannot sufficiently plead even a constitutionally cognizable injury that is "fairly traceable to … challenged conduct" that *postdated* his final alleged trade in August 2006. *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).

*Second*, Plaintiff has not shown that any "impact" on his trading position was "negative," as opposed to "neutral or beneficial." *Harry*, 889 F.3d at 112-13. The two August 2006 allegations relating to three-month Yen LIBOR both involved attempted *upward* manipulation of that benchmark, which could only have *benefited*

Plaintiff's position according to his own allegations. *Supra*, at 17. Plaintiff cannot "drag [an alleged] manipulator to court for having caused [his] good fortune." *Harry*, 889 F.3d at 112.

## II. The District Court Properly Dismissed Plaintiff's Sherman Act Claim For Lack Of Antitrust Standing.

The district court correctly dismissed the SAC's Sherman Act claim because Plaintiff's allegations failed both requirements of antitrust standing: (1) He is not an "efficient enforcer" of the antitrust laws, and (2) he has not suffered "antitrust injury." *Gelboim*, 823 F.3d at 772; *see* SA13-18.[13]

### A. Plaintiff Is Not An Efficient Enforcer.

"[N]ot every victim of an antitrust violation needs to be compensated … in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779. Supreme Court precedent prescribes four factors to be evaluated in determining whether a plaintiff is a "'proper party'" to enforce the antitrust laws:

(1)     the "indirectness of the asserted injury" and the "chain of causation";

(2)     whether "more direct victims" exist;

(3)     whether damages are "'highly speculative'"; and

---

[13] This Court's review is "limited to the contents of the" SAC, which is the "operative" complaint for purposes of reviewing dismissal of the antitrust claims, *McCray v. Lee*, 963 F.3d 110, 119 (2d Cir. 2020); *see* SA2. The Court should not consider allegations that Plaintiff belatedly added (without leave) in his TAC, which lacks *any* antitrust claims. *See* Br.56 n.10.

(4)     the need to avoid "the risk of duplicate recoveries" or "complex appor-

tionment of damages."

*Id.* at 778-79 (quoting *AGC*, 459 U.S. at 540-45).[14]  Because all four factors weigh

against Plaintiff, he is not an efficient enforcer.

### 1.     Plaintiff's Alleged Injury Is Too Indirect.

To determine whether an alleged violation is a "direct or remote cause" of an

alleged injury, courts examine the "'chain of causation' linking [to the] asserted in-

jury," look to the "relevant market," and assess whether the plaintiff's "transactions

were conducted directly or indirectly" with the defendants.  *Gelboim*, 823 F.3d at

772, 778-79.  Where, as here, the claim relies on "several somewhat vaguely defined

links," it is "obvious that any such injuries were only an indirect result" of the con-

duct.  *AGC*, 459 U.S. at 540-41.

Unlike a typical antitrust conspiracy to raise consumer prices, Plaintiff does

not allege that he transacted directly with any Defendant,[15] or even that he entered

---

[14]  Relying on *Lexmark International, Inc. v. Static Control Components, Inc.*, 572
U.S. 118 (2014), Plaintiff attempts to collapse this test into "proximate cause."
Br.57-59.  But that badly mischaracterizes *Lexmark*, which did not purport to modify
controlling antitrust precedent.  *See Gelboim*, 823 F.3d at 779 (applying efficient-
enforcer factors post-*Lexmark*); *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 771
F.App'x 498, 501 (2d Cir. 2019) (same).

[15]  While some courts have suggested a plaintiff might use a defendant's control
of the relevant market as a "proxy for the question of direct causation," *LIBOR VI*,

into an interest-rate swap or other transaction with payment obligations directly pegged to contemporaneous Euroyen TIBOR rates. Any asserted injury thus was, at most, "only an indirect result" of the conduct alleged. *AGC*, 459 U.S. at 541. It relies on the actions of "innumerable individual decision-makers," *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980), including BBA panel banks, JBA panel banks, and other traders in the Euroyen TIBOR futures market, all reacting to macroeconomic developments and innumerable other factors. Even if the SAC plausibly alleged an injury at all, *but see infra*, at 49-51 (discussing antitrust injury), any injury was highly indirect, flowing through an attenuated, multi-step causal chain that (among other problems) wrongly assumes a link between constantly fluctuating futures trading prices and daily published Euroyen TIBOR rates, *supra*, at 26. Other courts have found a lack of directness on analogous facts, *e.g.*, *Sonterra*, 366 F.Supp.3d at 544-46; *Sullivan v. Barclays PLC*, 2017 WL 685570, at *15-18 (S.D.N.Y. Feb. 21, 2017); *LIBOR VI*, 2016 WL 7378980, at *16, and these holdings align with the general rule that a plaintiff whose "theory of

---

2016 WL 7378980, at *16, that vague concept is no substitute for a direct counterparty relationship—certainly not where, as here, the challenged conduct did not even directly determine prices in the market. Regardless, Plaintiff has not plausibly alleged that Defendants controlled the extremely high market share necessary to theoretically achieve a proxy. *See id.*

liability rests on the independent actions of third and even fourth parties" fails to show direct causation, *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 15 (2010).

The fact that the alleged manipulations affected trading prices in both directions is yet another attenuating factor making this claim unlike a typical antitrust conspiracy to raise consumer prices. *Supra*, at 14-15. Plaintiff and putative class members are both buyers and sellers, meaning they "may well have benefited" from any alleged manipulation. *LIBOR VI*, 2016 WL 7378980, at *18. Plaintiff's present insistence that he must have been injured as a direct, "necessary consequence" of the alleged conduct, Br.61, again ignores his actual allegations.[16]

### 2. More Direct Victims Exist.

The second factor also weighs against Plaintiff because, as compared to him, it is indisputable that parties who directly transacted with bank defendants in instruments directly tied to Euroyen TIBOR would be less unsuited to bring an antitrust claim.[17]

Plaintiff acknowledges that he transacted with "unknow[n]" third parties on an exchange, Br.22 n.6, putting him in the vast class of indirect enforcers who raise

---

[16] If the TAC is considered, it confirms that, if anything, the alleged manipulation *benefited* Plaintiff. *See supra*, at 17.

[17] Contrary to Plaintiff's suggestion, Br.65, the named defendants' decision to focus their briefing below on other efficient-enforcer factors does not mean they conceded the absence of more direct victims, especially given how closely related this second factor is to the first.

"the very concern of damages disproportionate to wrongdoing" that antitrust-standing doctrine guards against. *Gelboim*, 823 F.3d at 779. Courts consistently deny antitrust standing to purchasers who did not deal directly with defendants, because "defendants secured no illegal benefit at [such plaintiffs'] expense," and permitting recovery "could subject antitrust violators to potentially ruinous liabilities, well in excess of their illegally-earned profits." *Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 583, 586 (3d Cir. 1979). Instead, "the most efficient enforcers" are those "most directly affected by a rise in prices or reduction in output." *Fisher v. Aurora Health Care, Inc.*, 558 F.App'x 653, 655-56 (7th Cir. 2014); *cf. Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977) (indirect purchasers of price-fixed goods lack standing to seek damages).

Plaintiff is off base in asserting that it is "hard to imagine a more direct victim" than himself. Br.65. His *own pleadings* identify other persons with less indirect relationships to the alleged manipulation. *E.g.*, SAC ¶480 (JA311) (direct transactions with "swaps traders"). Courts have recognized that "direct counter-parties" to defendants in transactions directly pegged to published benchmark rates, like interest-rate swaps, are less indirect enforcers. *Sullivan*, 2017 WL 685570, at *17-18. Unlike trades of Euroyen TIBOR futures before settlement—which are not linked to Euroyen TIBOR except insofar as they may "reflec[t] the market's prediction for what [Euroyen TIBOR] will be at settlement, which could be years away," *LIBOR*

46

*VI*, 2016 WL 7378980, at \*21—interest-rate swaps fix payment obligations directly by reference to benchmark interest rates. *LIBOR VII*, 299 F.Supp.3d at 487. As compared to Plaintiff, parties to such transactions would plainly be less indirect.

### 3. Plaintiff's Damages Are Highly Speculative.

Plaintiff's damages are also "highly speculative," a "sign that [he] is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779. Where, as here, calculation of damages rests on "multiple layers of speculation" that "essentially would require the creation of an 'alternative universe,'" *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 67 (2d Cir. 2019), or "independent factors" beyond the defendant's conduct, *AGC*, 459 U.S. at 542-43, damages are unduly speculative.

In *7 West 57th Street*, this Court rightly recognized that calculating damages on a LIBOR-manipulation claim involving instruments not directly "pegged to LIBOR" "would require speculation about how each of the 16 LIBOR panel banks would have answered the LIBOR question," followed by "speculat[ion about] how the hypothetical LIBOR would have affected" the instruments at issue. 771 F.App'x at 502-03. And in *LIBOR VI*, Judge Buchwald similarly observed that damages were speculative because the trading prices of futures contracts do not move in tandem with the benchmark levels announced on the day of trading. 2016 WL 7378980, at \*21-23.

The same is true here. "[T]o find antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect" of allegedly artificial submissions by multiple banks, the impact of that day's benchmark rates on market perceptions about future Euroyen TIBOR rates, and the price of the relevant futures contracts but for the alleged manipulation, among other factors. *Reading*, 631 F.2d at 13; *supra*, at 26. Plaintiff's damages theory requires piling speculation on speculation—a fact that further confirms his lack of antitrust standing.

### 4. There Is Substantial Risk Of Duplicative Recoveries Or Complex Apportionment.

Finally, Plaintiff's claims raise a significant "risk of duplicate recoveries" and "the danger of complex apportionment of damages." *AGC*, 459 U.S. at 543-44.

The risk of duplicative recovery here is acute, even aside from the fact that various Defendants paid regulatory fines and settlements for LIBOR-related claims. Br.12-13. Damages cannot simply be tied to trading volume, as futures contracts may be purchased and sold between third parties any number of times per day on an exchange, and if alleged manipulation affected a trade, it would simultaneously harm one third party while benefiting another. Penalizing Defendants for transactions from which they did not profit is problematic in itself; counting all such transactions would result in damages out of all proportion to Defendants' conduct, as "[b]illions in notional value … in Euroyen TIBOR futures contracts were transacted during the Class Period." SAC ¶89 (JA171). Plaintiff's citation to *Apple Inc. v. Pepper*, 139

S.Ct. 1514 (2019)—a monopolist-overcharge case involving parties in privity and vastly different markets and conduct—does nothing to address these concerns. The issue here is not that a defendant is directly profiting from its market-wide over-charges "felt by multiple market participants simultaneously," Br.69, but that granting damages to Plaintiff and the putative class, without a mechanism for con-necting damages to any Defendant's alleged profits and avoiding double-counting, raises serious risks of duplicative and disproportionate recovery.

That Plaintiff is an inefficient enforcer is confirmed by the overwhelming complexity of attempting to calculate damages for the "countless" transactions at issue, whose "ramified consequences are beyond conception." *Gelboim*, 823 F.3d at 780. For many transactions, "it may not even be apparent which party profited and which party was injured," or who sustained a net injury. *Sullivan*, 2017 WL 685570, at *19. Further, it would be "extraordinarily complex" to determine dam-ages for such a large class and account for intraday resales, offsetting positions, intraday price fluctuations, and other relevant factors. *Id.* These difficulties confirm that Plaintiff is not an efficient enforcer.

### B.    Plaintiff Failed To Allege Antitrust Injury.

The district court also correctly concluded that Plaintiff failed to allege an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl-O-*

49

*Mat, Inc.*, 429 U.S. 477, 489 (1977), which is an independent ground for affirmance. The SAC does not "identify or describe a single actual transaction underlying his claim," SA15, or otherwise provide the information needed to conclude that Plaintiff was injured *at all*. *Supra*, at 19.

Contrary to Plaintiff's suggestion, Br.55-57 & n.10, *Gelboim* does not relieve Plaintiff of the need to plausibly plead that he was injured. Unlike in *Gelboim*, the allegations here involve "'day-to-day' and 'episodic'" attempted manipulation of two different benchmark rates, requiring "[p]roof that a bank caused an artificial price" on particular dates. *LIBOR M&O*, 2016 WL 1558504, at *9. Moreover, the alleged manipulation was bidirectional, *see*, *e.g.*, SAC ¶159 (JA195) (lower), *id.* ¶161 (JA195-96) (higher), so transaction-specific information is needed to distinguish injuries from windfalls. As this Court held in *Harry*, a complaint that provides "just as much support" for being "*benefited*" by alleged manipulation as it does for being "*harmed*" does not adequately allege antitrust injury. 889 F.3d at 115.

*Gelboim* did not purport to reach a contrary conclusion; the defendants there allegedly "depress[ed]" a single benchmark *persistently*, a unidirectional scheme that, in the Court's estimation, plausibly injured the plaintiffs' financial positions. 823 F.3d at 774-76. The SAC contains no such theory. And later-added allegations in the TAC, if considered, only confirm that Plaintiff was not injured (and if anything

benefited) by Defendants' conduct. Plaintiff does not allege manipulation of Eu-royen TIBOR in July or August 2006, and his manipulation allegations regarding three-month Yen LIBOR in that timeframe involved attempted *upward* movements in that benchmark. *Supra*, at 17.

## III. The District Court Did Not Abuse Its Discretion In Denying Leave To Add RICO Claims.

The district court acted well within its discretion in denying Plaintiff's request to add RICO claims to the TAC. SA39-59. The court correctly concluded that Plaintiff's proposed claims were impermissibly extraterritorial and that he lacked statutory standing. Additionally, Plaintiff failed to adequately plead a RICO claim.

### A. Plaintiff's Proposed RICO Claims Were Impermissibly Extraterritorial.

"The Supreme Court has already held that civil RICO does not rebut the pre-sumption against extraterritoriality." *Bascuñán v. Elsaca*, 927 F.3d 108, 117 (2d Cir. 2019). Thus, a plaintiff must "allege and prove a domestic injury." *RJR Nabisco, Inc. v. European Cmty.*, 136 S.Ct. 2090, 2111 (2016). A RICO claim predicated on wire fraud, like Plaintiff's, "involves sufficient domestic conduct" *only* where the defendant's use of "domestic mail or wires in furtherance of a scheme to defraud … was a *core component* of the scheme." *Bascuñán*, 927 F.3d at 122 (emphasis added). The domestic "use of the mail or wires must be essential, rather than merely incidental, to the scheme." *Id.*

Plaintiff did not make the requisite "extensive factual allegations" of core do-
mestic conduct.  SA55.  His RICO claim is based on an alleged scheme whereby
foreign Defendants made or facilitated false submissions to British and Japanese
banking associations in London and Tokyo, regarding benchmark rates for a foreign
currency, as part of an enterprise that "[t]he parties do not dispute … is foreign."
SA54-55; *see* JA971; SA87.  This case is thus similar to *Petroleos*, which upheld
dismissal of a RICO claim predicated on alleged wire fraud in connection with brib-
ery of Mexican officials.  572 F.App'x at 61.  The plaintiffs in *Petroleos* pleaded
"several allegations of domestic activity," including that the scheme's "financing
was obtained here, the invoices were sent to the bank for payment, and the bank
issued payment" here.  *Id.*  But even these contacts were deemed "minimal" and
"insufficient to sustain RICO jurisdiction" because the scheme was not "directed
from (or to) the United States" and the key "activities involved in the alleged
scheme—falsifying the invoices, the bribes, the approval of the false invoices—took
place outside of the United States."  *Id.*

Here, the district court correctly applied *Petroleos* and other extraterritoriality
precedents to reject Plaintiff's claims because their "core" is fundamentally foreign.

SA55.[18] As the court recognized, SA54, Plaintiff's alleged foreign scheme is a far

cry from the paradigmatic domestic case in which "defendants hatched schemes to

defraud in the United States" and carried out the core of the scheme here. *European*

*Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 142 (2d Cir. 2014). For example, this

Court in *Bascuñán* found RICO claims based on wire fraud sufficiently domestic

where the "essence" of the relevant scheme was that the defendant created a "bogus"

trust with a "bank account located and administered in New York," "funded" this

"New York Bank account" with money belonging to the plaintiff, "faxed a letter" to

the New York bank "authorizing [fraudulent] biannual payments," and "re-

peated[ly]" used "domestic mail and wires to order" the New York bank "to transfer

millions of dollars from that account to himself." 927 F.3d at 112-13, 123. The use

of domestic wires to target a domestic account administered by a domestic bank was

thus "a core component of the alleged scheme," and the claim thus "focus[ed] on

domestic conduct." *Id.* at 123. Unlike Plaintiff's claim here, the alleged conduct in

---

[18]  *See LIBOR I*, 935 F.Supp.2d at 734; *FrontPoint Asian Event Driven Fund, LP v. Citibank, N.A.*, 2017 WL 3600425, at *14 (S.D.N.Y. Aug. 18, 2017); *FrontPoint Asian Event Driven Fund, LP v. Citibank, N.A.*, 2018 WL 4830087, at *10 (S.D.N.Y. Oct. 4, 2018), *vacated and remanded on other grounds sub nom. Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370 (2d Cir. 2021); *Sullivan v. Barclays PLC*, 2017 WL 685570, at *34 (S.D.N.Y. Feb. 21, 2017); *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F.Supp.3d 521, 582 (S.D.N.Y. 2017); *Sonterra*, 366 F.Supp.3d at 556-57; *Fire & Police Pension Ass'n v. Bank of Montreal*, 368 F.Supp.3d 681, 709-10 (S.D.N.Y. 2019).

*Bascuñán* was not a fundamentally foreign scheme between foreign persons that was conducted "around the world," Br.12, with only incidental domestic effects.

Plaintiff's contrary argument relies primarily on allegations that some communications between foreign-based individuals may have passed "through" U.S. wires, Br.50-51, but these are quintessentially "*incidental* domestic wire transmissions," *United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020) (emphasis added). The happenstance that foreign-based traders' communications may have been "routed through" U.S. servers, Br.51, or in isolated instances made while visiting U.S. soil or while communicating with a U.S. person, *supra*, at 32-34, does not show a scheme with a genuinely domestic "core" that is "focus[ed] on" domestic conduct, *Bascuñán*, 927 F.3d at 123. The essence of the alleged misconduct here was that foreign Yen LIBOR submitters reported artificial rates to the BBA in London at the behest of foreign colleagues, which supposedly led other foreign banks to report artificial rates to the Tokyo-based JBA. *Supra*, at 26. Unlike *Napout*'s bribery scheme—where "wire transfers originating in the United States" from "U.S. bank accounts" were "integral to the transmission of the bribes" and "central to the alleged schemes," 963 F.3d at 181—Defendants' alleged conduct is fundamentally foreign. And *Plaintiff's* claims do not become domestic simply because the foreign conduct he alleges was sometimes motivated by *third-party* over-the-counter

"transaction[s]" (not at issue here) involving "U.S. counterparties," who later received "confirmations" through domestic wires. Br.51.

Contrary to Plaintiff's assertions, Br.52, *RJR Nabisco* fully supports the district court's ruling. The Supreme Court in that case *agreed* with this Court's holding that RICO does not apply extraterritorially except insofar as "the predicates … themselves" do, 136 S.Ct. at 2102, 2099, and did not disturb this Court's conclusion that the wire-fraud statute does not apply extraterritorially, *id.* at 2105-06. The Supreme Court overturned this Court's decision only insofar as this Court "thought that the presumption against extraterritoriality did *not* apply to" RICO's private right of action. *Id.* at 2106 (emphasis added). That conclusion casts no doubt on the district court's determination that Plaintiff's claim "is based on the alleged actions of foreign and international institutions that submitted false information to the BBA and JBA, located in London and Tokyo, respectively." SA55. The absence of domestic conduct at the "core" of the alleged scheme makes this case impermissibly extraterritorial. *Bascuñán*, 927 F.3d at 121.

Finally, Plaintiff's reliance on regulatory settlements and criminal charges is misplaced. *See* Br.51. Particularly given the dynamic nature of extraterritoriality precedents in recent years, a party's after-the-fact decision not to contest an enforcement action (and the government's willingness to bring one) says nothing about whether a private plaintiff may assert sweeping, fundamentally foreign RICO claims

55

or the proper scope of civil RICO.  Recognizing the distinctions between criminal

enforcement and private claims, courts have properly rejected similar arguments in

analogous contexts.  *E.g.*, *Sonterra*, 277 F.Supp.3d at 581.

### B.  Plaintiff Lacks Statutory Standing To Raise The Proposed RICO Claims.

The district court also correctly held that Plaintiff's alleged injuries are "'too

remote'" and "'speculative'" to confer statutory standing under RICO.  SA56-57.

For the same reasons that Plaintiff lacks antitrust standing, he has not adequately

pleaded an injury caused by Defendants that would allow him to pursue RICO

claims.  *Supra*, at 42-51; *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267-68

(1992) ("Congress modeled § 1964(c) on the civil-action provision of the federal

antitrust laws.").

### C.  Plaintiff's Proposed RICO Claims Were Inadequately Pleaded.

The Court may also affirm on the ground that Plaintiff "fail[ed] to plead es-

sential elements of a RICO claim."  SA52.  As the Court has warned, "'RICO claims

premised on mail or wire fraud in particular must be particularly scrutinized because

of the relative ease with which a plaintiff may mold a RICO pattern from allegations

that, upon closer scrutiny, do not support it.'"  *Grace Int'l Assembly of God v. Festa*,

797 F.App'x 603, 605 (2d Cir. 2019).  Plaintiff's claims collapse under that scrutiny.

A RICO claim requires showing "(1) that the defendant (2) through the com-

mission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity'

(5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990) (quoting 18 U.S.C. §1962(a)-(c)). These acts must be properly domestic. *Supra*, at 51-52. Where wire fraud is the alleged predicate, plaintiffs generally must also satisfy Rule 9(b)'s heightened requirements by pleading "the contents of the communications, who was involved, where and when they took place, and explain[ing] why they were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). And Plaintiff must plead that "each individual defendant," *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001), committed (or aided and abetted) at least *two* separate acts of wire fraud through a scheme to defraud, to obtain money or property, furthered by the use of interstate wires. *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1994 WL 88129, at *6 (S.D.N.Y. Mar. 15, 1994).

Here, the PTAC's RICO allegations impermissibly lumped together all Defendants and failed to distinguish each Defendant's role; duration; and extent of participation, knowledge, intent, or acts in furtherance of any alleged scheme or conspiracy. PTAC ¶¶754-787 (JA969-81). The PTAC further failed to allege that *each* Defendant committed *two* predicate *domestic* acts in furtherance of a scheme, which

is the "bare minimum of a RICO charge." *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992); *see Merrill Lynch*, 1994 WL 88129, at *11.

For these same reasons, Plaintiff "fails to state a RICO conspiracy claim under 18 U.S.C. § 1962(d)." SA52. A RICO conspiracy claim "'necessarily must fail if the substantive claims are themselves deficient.'" *Knoll v. Schectman*, 275 F.App'x 50, 51 (2d Cir. 2008). Moreover, the RICO conspiracy claim independently fails because it does not allege facts demonstrating each Defendant's "conscious agreement" to commit predicate acts. *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25-26 & n.4 (2d Cir. 1990). The PTAC's RICO conspiracy claim fatally omits allegations showing—for *all* Defendants—a domestic, conscious, *interbank* (not intrabank) conspiracy with a common aim. *See id.* Without specificity as to "'what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it,'" Plaintiff's claim fails. *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F.Supp.2d 362, 373 (E.D.N.Y. 2002).

## IV. The District Court Did Not Abuse Its Discretion In Dismissing Plaintiff's Expanded CEA Claims.

The TAC purported to expand the putative class period to run from January 1, 2006 through June 30, 2011, rather than through December 31, 2010. TAC ¶937 (JA1732). Because Plaintiff did not obtain the court's leave to so amend the complaint (by then limited to CEA claims), *see* Fed.R.Civ.P. 15(a)(2), this amendment

was effectively a request for leave to add six months of new claims, reviewable only "for abuse of discretion," *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003).

The district court correctly dismissed these new claims. SA60. In addition to being impermissibly extraterritorial and inadequately pleaded, *supra* Part I, Plaintiff has no personal stake in litigating claims involving conduct not implicating his July and August 2006 trades, and thus lacks class standing. The new claims are also time-barred.

### A.    Plaintiff Lacks Class Standing To Litigate The New Claims.

A named plaintiff has standing to litigate claims on behalf of a class only if he plausibly alleges: "'(1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct'" allegedly injuring the putative class. *Policemen's Fund*, 775 F.3d at 161. This test "derives from constitutional standing principles" and is "distinct" from the adequate-class-representative inquiry under Rule 23(a). *Id.*

Here, Plaintiff's attenuated causal chain and lack of allegations regarding relevant conduct foreclose standing under the first prong. *Supra*, at 16-17, 26. As to the second, the "core question" is whether Plaintiff "has a sufficiently personal and concrete stake" in the class claims. *Policemen's Fund*, 775 F.3d at 163. That prong

is not satisfied where there will be "significant differences in the proof that will be offered" to support the named plaintiff's own claims and the putative class's claims—a named plaintiff lacks "any real interest" in litigating claims that require "an expanded evidentiary showing" beyond the one needed to prove his own. *Id.* Conduct affecting the plaintiff does not implicate "'the same set of concerns'" as that affecting the class merely because the conduct is similar or part of an overarching policy. *Id.* at 161. Claims involving different instances of similar conduct often require "'very different proof,'" foreclosing class standing. *Id.* at 162.

In *Policemen's Fund*, for example, the named plaintiffs lacked standing to assert classwide claims against the trustee of 530 mortgage-backed security trusts, even though the plaintiffs—who had invested in twenty-six of them—alleged that the trustee improperly failed to take certain actions common to all the trusts in response to pervasive defects among the mortgages underlying the trusts, all of which were originated by the same mortgage company. 775 F.3d at 156-57, 162-63. The plaintiffs even argued that their claims and the class's claims implicated a single "policy of 'inaction'" that was "applicable to all of the trusts at issue." *Id.* at 162. Notwithstanding these commonalities, the plaintiffs lacked class standing because the trustee's duty to act and any alleged breach would need to be "proved loan-by-loan and trust-by-trust," *id.*, "unavoidably generat[ing] significant differences in the proof that w[ould] be offered," *id.* at 163.

Here, the district court correctly held that Plaintiff's claims would not impli-
cate the "same set of concerns" as the absent class members'. Like the loan-by-loan
and trust-by-trust nature of the claims in *Policemen's Fund*, Plaintiff's "'[t]rader-
based claims'" here must be assessed trade-by-trade in light of "'day-to-day and ep-
isodic'" allegations of sporadic manipulation involving different tenors of different
benchmarks being pushed in different directions by different defendants. SA65.
Plaintiff therefore lacks any concrete interest in litigating the new class claims.

Contrary to Plaintiff's portrayal, the problem is not merely how "the class
period is defined" or that Plaintiff did not trade "on the very first and very last day
of the proposed class period." Br.71. The day-to-day and trade-to-trade nature of
the claims "unavoidably generates significant differences in the proof that will be
offered." *Policemen's Fund*, 775 F.3d at 163. It does not matter whether Plaintiff
"*could* … offe[r] evidence concerning" the class's claims; his theoretical ability to
do so "ha[s] no bearing on" whether he has "any real interest" in proving their
claims. *Id.*

This Court's decision in *NECA-IBEW Health & Welfare Fund v. Goldman
Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), reinforces the point. There, an investor
in two mortgage-backed security offerings claimed that the issuer had misrepre-
sented the quality of the mortgages underlying all seventeen offerings in light of
pervasive underwriting problems by the originators. *Id.* at 149, 151-53. Although

the claims focused on the same types of harm flowing from the same alleged mis-representations in an overarching "Shelf Registration Statement" and "nearly identical misstatements contained in distinct Prospectus Supplements," the Court re-jected class standing as to most of the offerings due to differences in proof as to "whether the particular originators of the loans backing the particular Offering … had in fact abandoned [their] underwriting guidelines, rendering defendants' Offer-ing Documents false or misleading." *Id.* at 163. Accordingly, the named plaintiff could not assert class claims except as to the seven offerings involving the same originators as the plaintiff's own investment—*i.e.*, those involving the same proof. *Id.* at 163-64.

So too here. As between Plaintiff's alleged injuries and those of the class, it is plain that "each of those alleged injuries has the potential to be very different" and will "turn on very different proof." *NECA-IBEW*, 693 F.3d at 163.[19] The district court did not abuse its discretion or otherwise err in dismissing the new CEA claims, as other courts have done on analogous facts. *E.g.*, *LIBOR M&O*, 2016 WL

---

[19] Indeed, the interests of members of the putative class as defined are inherently opposed to *each other*. Plaintiff purports to represent "*[a]ll*" Euroyen TIBOR fu-tures traders, whether they were long or short on a particular trade or particular date. TAC ¶937 (JA1732) (emphasis added). Plaintiff does not allege facts showing how anyone could simultaneously have a concrete stake in both sides of the same trades and same trading dates, where (on Plaintiff's theory) one side was harmed and the other benefited.

1558504, at *9 ("[T]he named plaintiffs do not have class standing to bring claims on days on which they did not hold a relevant net position."); *see also Merryman v. Citigroup, Inc.*, 2018 WL 1621495, at *11 (S.D.N.Y. Mar. 22, 2018); *Fletcher v. ConvergEx Grp. LLC*, 388 F.Supp.3d 293, 297 (S.D.N.Y. 2019).

### B.    Plaintiff's New CEA Claims Are Time-Barred.

Alternatively, the district court's decision should be affirmed on the straight-forward ground that Plaintiff's new CEA claims are barred by the statute of limitations.  This issue was fully briefed below, though the district court did not address it in light of its class-standing holding.  SA65 n.2.

A plaintiff must bring a CEA claim within "two years after the date the cause of action arises."  7 U.S.C. §25(c).  A claim "arises" when a plaintiff has "inquiry notice."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141 (2d Cir. 2012).  Here, the district court has already held—in a ruling that Plaintiff has not challenged and thus cannot dispute now—that litigants were on notice of potential CEA claims by "no later than July 26, 2011."  SA43.  Indeed, Plaintiff *admits* he could have discovered UBS's alleged conduct by July 26, 2011, and other defendants' by February 2012.  TAC ¶¶944, 946, 949-951 (JA1734-37).  Plaintiff did not file a pleading proposing to

expand the class, however, until December 18, 2015—long after the two-year limitations period had expired.[20]

*American Pipe* tolling does not change the analysis. Under *American Pipe*, "the commencement of a class action suspends the applicable statute of limitations" as to all *absent class members* for the "substantive claims being brought against" the defendant. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554-55 (1974). It "does not toll the statute of limitations for named plaintiffs," whose claims are already before the court. *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 612 (3d Cir. 2018). Indeed, amended claims that expand on or otherwise "differ from those raised in the original class suit" *cannot* be subject to tolling because they necessarily fall outside the scope of the previous complaint. *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 355 (1983) (Powell, J., concurring). Tolling is plainly improper here, where the SAC did not provide Defendants notice of "the essential information necessary to determine both the subject matter and size of the" expanded litigation. *Am. Pipe*, 414 U.S. at 554-55.

The relation-back doctrine under Federal Rule of Civil Procedure 15(c)(1) also does not save the new claims. The CEA does not expressly "allo[w] relation

---

[20] *See* Dist.Ct.Dkt. 573, at 3-4 (Feb. 18, 2016) (letter from Defendants acknowledging that "Plaintiff first sought to assert these claims … on December 18, 2015") (emphasis omitted).

back" here. Fed.R.Civ.P. 15(c)(1)(A). Nor do the new claims "ar[ise] out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," Fed.R.Civ.P. 15(c)(1)(B); they are "day-to-day and episodic" claims involving distinct allegations of misconduct and different trades. SA65. Finally, the amended complaint does not merely "chang[e] … the naming of the party against whom a claim is asserted" to correct a "mistake concerning the proper party's identity," Fed.R.Civ.P. 15(c)(1)(C)(ii); it asserted new substantive claims, including against pre-existing parties.

For these reasons, the Court may affirm dismissal of the new CEA claims because they are time-barred, as the district court did in *LIBOR M&O*, 2016 WL 1558504, at *11.

**CONCLUSION**

The judgment should be affirmed.


Dated:  May 21, 2021                    Respectfully submitted,


/s/ Thomas G. Hungar
Thomas G. Hungar
Russell B. Balikian
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Mark A. Kirsch
Eric J. Stock
Jefferson E. Bell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

*Counsel for Defendants-Appellees*
*UBS AG and UBS Securities*
*Japan Co., Ltd.*

/s/ Leigh Nathanson
Leigh Nathanson
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100

Paul Alessio Mezzina
Kathryn Running
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

*Counsel for Defendant-Appellee-
Cross-Appellant Barclays Bank PLC*

/s/ David S. Lesser
David S. Lesser
Jamie Dycus
WILMER CUTLER PICKERING HALE
   & DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Counsel for Defendants-Appellees
The Royal Bank of Scotland plc, The
Royal Bank of Scotland Group plc,
and RBS Securities Japan Ltd.*

/s/ David R. Gelfand
David R. Gelfand
Tawfiq S. Rangwala
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5000

Mark D. Villaverde
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
(424) 386-4000

*Counsel for Defendant-Appellee-Cross-
Appellant Coöperatieve Rabobank U.A.
(f/k/a Coöperatieve Centrale Raif-
feisen-Boerenleenbank B.A.)*

/s/ Steven Wolowitz
Steven Wolowitz
Andrew J. Calica
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

*Counsel for Defendant-Appellee-
Cross-Appellant Société Générale*

## CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the type-volume limitation established by this Court's Order of April 29, 2021, because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 14,982 words, as determined by the word-count function of Microsoft Word.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:       May 21, 2021

/s/ Thomas G. Hungar
Thomas G. Hungar

## CERTIFICATE OF SERVICE

I hereby certify that, on May 21, 2021, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

/s/ Thomas G. Hungar
Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500